UNITED STATES of America,
Plaintiff-Appellee,

v.

Andrew RENFRO, Defendant-Appellant.

No. 79–5172.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 12, 1980.

Decided April 14, 1980.

Rehearing and Rehearing En Ranc
Denied June 13, 1980.

Andrew Renfro, pro se, and James R. Willis, Cleveland, Ohio, for defendant-appellant.

James K. Robinson, U. S. Atty., Richard L. Delonis, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before WEICK, Circuit Judge and PHILLIPS and PECK, Senior Circuit Judges.

WEICK, Circuit Judge.

Andrew Renfro was convicted in the United States District Court for the Eastern Division of Michigan of conspiracy, possession of heroin with intent to distribute, and distribution of heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846. Prior to the federal proceedings, Renfro and three alleged co-conspirators, James Griffin, Andrea Payne and Tandee Leslie, were charged with the same offenses in the Recorder's Court for the City of Detroit. The charges against Renfro were dismissed after the Recorder's Court ordered the suppression of critical prosecution evidence. The other defendants were convicted in the state court.

In his appeal, Renfro contends that federal prosecution was barred by the Department of Justice's *Petite* policy, which limits dual state and federal prosecutions for the same offenses under certain specified circumstances, none of which existed in the present case. He further contends that the District Court erred in refusing to suppress evidence, in permitting co-conspirator statements to be admitted into evidence, and in determining that there was sufficient evidence to support the conviction for conspiracy. Finally, the appellant contends that the District Court erred in permitting an

alleged unqualified woman juror to remain on the jury, although he and his counsel in open court had expressly agreed that she could remain. We find appellant's arguments to be without merit and affirm the convictions.

I

Renfro was implicated in the crime as a result of an undercover operation by the Wayne County Sheriff's Department, Metropolitan Narcotics Squad. The undercover officer, Mary Brown, and two of Renfro's co-conspirators, James Griffin and Andrea Payne, testified at the trial as to the events occurring on October 14, 1976, when the crime was committed. This testimony was supplemented by the testimony of surveillance officers, expert witnesses, and physical evidence seized at the appellant's residence. The defendant rested his case without offering any evidence.

The evidence shows that on October 14, 1976, undercover Officer Mary Brown, a deputy narcotics investigator for the Wayne County Sheriff's Department, called James Griffin and sought to purchase from him $5,500 worth of heroin. James Griffin indicated that he could arrange such a transaction. Brown met Griffin at his house and proceeded with him to a house located at 18272 Santa Rosa, in Northwest Detroit. Brown was introduced to Andrea Payne who lived at this address. Payne was informed by Griffin that Mary Brown desired to purchase $5,500 of heroin. Payne then placed a call and spoke with a person named "Cherry." Following this phone call, Andrea Payne took Griffin and Brown to a bungalow on Cruse Street where Brown met James Cherry and an unidentified black man and woman. A small sample of heroin was produced by Cherry. The sample was tested by Griffin, who found it to be of poor quality. Griffin recommended that Brown not purchase that particular batch of heroin.

At this point, Brown testified that Cherry and Andrea Payne went into the bedroom. Shortly thereafter, Brown was called into the room. Andrea Payne was holding a telephone receiver and she informed Brown that a friend of hers had just got in ten to twelve pounds of heroin and could sell five ounces of heroin for $5,500. Andrea Payne told Brown that they would be going to a 25-room mansion on West McNichols and LaSalle. Griffin, Payne and Brown proceeded to 2460 West McNichols. Griffin handed Payne $50 (previously given to Griffin by Brown) to purchase a sample of the heroin. Griffin and Brown waited in the car while Andrea Payne went into Renfro's house. Payne testified at the trial that, once in the house, she met Andrew Renfro who told her to wait a moment. Payne sat down and waited. A short time later, Renfro came back and told Payne that there was a piece of aluminum foil on the table that was hers. According to Payne, no money changed hands at this point and Payne kept the $50. Brown testified that when Payne returned to the car she told her that, while she was inside, she helped weigh and package part of the ten to twelve pounds of heroin. Inside the foil package which Payne had taken from Renfro's table was about $50 worth of heroin. Griffin tested this heroin and found that the quality was very good. Brown said that she was willing to buy heroin from this batch.

Upon returning to Payne's house, Payne made a phone call. Brown testified that the name Andrew was mentioned, but Payne testified that she had called Cherry. Payne told the other party to the phone call that Brown and Griffin were pleased with the sample and that the deal for the rest of the heroin could be consummated. Brown was informed that delivery of the heroin would be made to Payne's house and that it would take about an hour before the delivery could be made. Payne left the room and went downstairs. Griffin used the rest of the heroin and then fell asleep. Brown was able to use the phone to inform her fellow officers that the heroin would be delivered to Payne's address in about an hour. After a long wait, Brown mentioned to Payne that the delivery was taking a long time. Payne then placed another phone call. After the phone call, Payne

informed Brown that the heroin would be delivered by her source's girlfriend and that she would be driving a new Cadillac. Then Payne and Brown counted out the money which was to be paid for the heroin and wrapped it with a rubber band. Payne went back downstairs again and Brown was able to use the phone to update the other officers involved in the case.

A surveillance team had followed Brown, Griffin and Payne when they went to Renfro's house to obtain the sample. From that point until the arrests were made, the house was constantly under surveillance. Officers observed Tandee Leslie leave Renfro's house driving a new Cadillac and proceed to Payne's house. When Leslie arrived at Payne's house, Brown came downstairs and Brown, Payne and Leslie went into a back room on the first floor. Leslie produced a clear packet of brown powder, later identified by the experts as heroin, and exchanged the packet for $5,500 of marked money. As Leslie was leaving, Brown went back upstairs and made another phone call to relay to the surveillance crew that the transaction had taken place and giving a description of Leslie. Leslie was followed by surveillance officers back to Renfro's address.

Brown awakened Griffin and left the house. Payne had to move her car from the driveway so that Brown and Griffin could get out. Brown started at that time to give the prearranged signal (combing her hair) that would indicate for the other police officers to move in to make the arrest, however, because it was so dark outside, the signal went unobserved. Brown and Griffin left in Griffin's car. Payne pulled her car back into the driveway, went back into the house, and came back outside while in the process of putting on her coat. She drove along the same route that Griffin and Brown had taken just shortly before. After the surveillance on Payne's car had begun, the other officers realized that, by mistake, no one had followed Griffin's car. Sergeant Turner, the officer in charge of the undercover activities, and several other officers, immediately left the area of Payne's house to try to catch up with Grif-

fin's car. These officers were in unmarked vehicles and using their portable, blue flashing lights when they passed Payne's car. Shortly after the unmarked cars passed Payne's car, she turned off and proceeded directly, but without any increase in speed, to Renfro's house.

The officers caught up with Griffin's car after Payne had made the turn-off. (By this time they had turned off their flashing lights.) They observed Brown combing her hair in the passenger seat of the car and proceeded to stop the car and arrest both Griffin and Brown. (Brown was arrested just to preserve her identity.) Fearing that Andrea Payne had observed their pursuit of Griffin's car and that she had gone to warn Renfro, the officers had a brief meeting at a University of Detroit parking lot. The officers donned bullet-proof vests with their badges pinned to the front. Then they proceeded directly to Renfro's house. Sergeant Turner pulled his car into Renfro's driveway. A regular Detroit police car pulled in behind him. Other officers moved to surround the house. Although there is conflicting testimony about what happened next, the District Court found:

> When they arrived at the West McNichols address, the officers immediately approached the front door. Through a window they observed Payne, Leslie, a black male subsequently identified as Andrew Renfro, and an unidentified black female seated in the living room. The officers, unobserved to that point, knocked at the front, identified themselves and stated that they had come to make an arrest. At that point, Leslie and Renfro hurriedly exited the living room. The officers then saw Renfro through a second story window, moving back and forth; they also heard a toilet flushing. None of the occupants would open the front door.

> The officers tried futilely to force the front door and subsequently gained entry through a side door. . . .

Other officers were able to gain entr through a back door.

Once inside, several officers proceeded upstairs where they found Renfro in a bedroom near the only entrance to one of the upstairs bathrooms. The toilet in the bathroom was running. One of the officers went into the bathroom and was able to retrieve a plastic bag containing traces of an unidentified white powder from the toilet bowl before the flush cycle was completed. Samples of a residue wiped from the surface of the toilet revealed the presence of heroin. Near Renfro's feet, the officers found a heat-sealed plastic bag containing heroin. In the same bedroom, in plain view, the officers found a blender containing heroin traces and a triple-beam scale. Sergeant Turner testified that a blender is commonly used to break the heroin down from a caked form to a powder form and to mix in a diluting substance. The scales would then be used to weigh smaller quantities for purposes of resale. He testified that they were tools of a narcotics distributor rather than of a typical user.

Leslie was found in another upstairs bedroom stuffing the marked purchase money into her underwear. Another upstairs bathroom—the one in which Renfro had been seen prior to the forced entry—was laden with dust. The toilet in this bathroom contained a murky brown liquid which, when tested, revealed the presence of heroin. Renfro, Payne, Leslie, and the other black woman were arrested. Based on the evidence which he had seen in plain view in Renfro's house, Sergeant Turner felt that a general search of the house would be necessary. At this time, Sergeant Turner sent Officers Borders and Lang to

secure a search warrant for the house.[1] No further action was taken until the search warrant arrived and was presented to Mr. Renfro.

## II

Appellant's first contention is that his constitutional rights were violated when the Justice Department proceeded to bring federal charges against him after identical State charges arising out of the same transaction had been dismissed. The appellant concedes that under the dual sovereign theory enunciated by the Supreme Court in *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) and recently reaffirmed in *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), state and federal prosecutions for the same offense do not violate the provisions of the Double Jeopardy Clause. However, the appellant claims that the government's violation of its own *Petite* policy [2] is a violation of due process or alternatively that the arbitrary selective enforcement of the policy violates the equal protection principles inherent in the Due Process Clause of the Fifth Amendment.

The government's position is that the *Petite* policy gives no rights to a criminal defendant and that the *Petite* policy was in fact never meant to apply except where the State case was resolved on its merits. In support of their latter position, the government cites a statement made by Attorney General Benjamin R. Civiletti while he was still a Deputy Attorney General:

1. The entry took place at about 9:30 p. m. A search warrant was obtained and served upon Mr. Renfro at about 11:45 p. m. The warrant, however, incorrectly listed the address of the house to be searched as 2480 West McNichols (instead of 2460 West McNichols). The government did not rely on the warrant to give any authority for making the initial entry or for seizure of any of the evidence. Only evidence which was in plain view when the officers entered the house was admitted into evidence at the trial.

2. The *Petite* policy derives its name from *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) in which the Supreme Court

reversed a District Court order denying the government's motion to dismiss an indictment where the defendant had been convicted for the same offense in a state court. The *Petite* policy was established by Attorney General William Rogers in 1959 and has been followed with some minor changes ever since. Briefly stated the policy provides:

No Federal case should be tried when there has been a State prosecution for substantially the same act or acts without a recommendation having been made [to and approved by] the Assistant Attorney General demonstrating compelling Federal interests for such prosecution.

[T]he *Petite* policy is applicable whenever a prior state prosecution has ended in a determination on the merits of the case, whether the defendant has been acquitted or convicted. It is not usually applied when the state prosecution has ended without a determination of the defendant's guilt or innocence as, for example, where the case is dismissed in trial order suppressing evidence.[3]

■ This Circuit has recently determined that the *Petite* policy "is not constitutionally mandated and confers no rights upon the accused." *United States v. Frederick*, 583 F.2d 273 (6th Cir. 1978), *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 80 (1979). The government is the only party with standing to assert the applicability of the *Petite* policy in seeking the dismissal of an indictment. *See Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977). *Thompson v. United States*, —— U.S. ——, 100 S.Ct. 512, 62 L.Ed.2d 457 (1980). The decision of whether or not to prosecute, like the decision of whether or not to grant immunity from prosecution, is a decision firmly committed by the constitution to the executive branch of the government. We agree with the District Court that "intervention by the court in the internal affairs of the Justice Department would clearly constitute a violation of the Separation of Powers Doctrine."

### III

■ Appellant next urges that the District Court erred in denying his motion to suppress the evidence which was seized after the forcible entry into his residence. While the Recorder's Court for the City of Detroit suppressed this evidence, the decision of a state court is not binding on a federal court on questions of admissibility of evidence in a federal prosecution. In *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1959), the Supreme Court said:

In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.[4]

■ The law in this Circuit requires the presence of exigent circumstances before a warrantless, forcible entry may be made into a private residence for purposes of making a search or making a felony arrest. *United States v. Korman*, 614 F.2d 541 (6th Cir. 1980, cert. filed March 3, 1980, No. 79–1345). *United States v. Shye*, 492 F.2d 886 (6th Cir. 1974); *United States v. Killebrew*, 560 F.2d 729 (6th Cir. 1977); *United States v. Sumlin*, 567 F.2d 684, 686 n. 1 (6th Cir. 1977), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978); *United States v. Scott*, 578 F.2d 1186 (6th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). *See also, United States v. Houle*, 603 F.2d 1297 (8th Cir. 1979); *United States v. Reed*, 572 F.2d 412 (2nd Cir.), *cert. denied, sub nom., Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. *en banc*, 1970). We are satisfied that such exigent circumstances as would justify the warrantless entry existed in this case.

■ The existence of probable cause to make the arrests of Andrea Payne and Leslie for serious felonies is not disputed. The police had certain knowledge that both of these individuals were inside Renfro's house. There was a reasonable possibility that the suspects' suspicions had been aroused. Under these circumstances, it is clear that the police could, at least, go to the door, knock, and attempt to make a

---

**3.** This statement appeared in a speech made at the University of Virginia School of Law on April 12, 1978.

**4.** 364 U.S. at 223–24, 80 S.Ct. at 1447. *See also, United States v. Dudek*, 530 F.2d 684 (6th Cir. 1976).

peaceable entry for the purposes of making the arrests. The police did not at that time intend to arrest Renfro or to search his residence. When the police knocked on the door and announced their presence, instead of coming to the door, Renfro and Leslie ran upstairs and appeared to the officers to be in the process of destroying evidence. It was not until this happened that the officers made a forcible entry into the residence for the purpose of making the arrests and preventing the further destruction of evidence which the officers had reason to believe was on the premises.

Renfro contends that the actions of the police in making a forcible entry into his home cannot be condoned because the officers created their own exigent circumstances by announcing their presence. We do not agree that the officers created their own exigent circumstances in this case. The government is not relying on the defendant's knowledge of the police presence alone as creating the exigent circumstances justifying the warrantless entry. Renfro's and Leslie's actions in attempting to destroy evidence were a sudden intervening development which changed the complexion of the entire incident and necessitated immediate action. *United States v. Scott*, 578 F.2d 1186, 1190 (6th Cir. 1978); *United States v. Shye*, 492 F.2d 886 (6th Cir. 1974). Once properly within the residence, the officers were entitled to prevent further destruction of evidence, seize evidence in plain view, and effectuate the arrests. *See, United States v. Korman, supra.*

## IV

Once the admissibility of the evidence seized in Renfro's house is upheld, there can be no doubt that there is sufficient evidence that Renfro was an active participant in the conspiracy to sell heroin to Brown.[5] Alternatively, Renfro claims that Griffin's and Payne's statements should not be admitted against him because they were not members of the conspiracy— rather they were agents for the buyer, Mary Brown. While it seems true that Griffin's and Payne's interests in consummating the transaction were different from those of Renfro, this fact alone does not preclude them from being co-conspirators. Griffin and Payne knowingly and intentionally participated in the violation of the laws of the United States. Their acts furthered the joint purpose of violating those laws and consummating an illegal transaction. This is enough to hold them to be conspirators with Renfro and to make their statements admissible against him under Federal Rules of Evidence, rule 801(d)(2)(E).[6]

## V

Finally, appellant argues that the District Court erred in allowing an alleged unqualified woman juror to remain on the jury. In making this argument, defense counsel has radically altered its position from the stance taken prior to the return of the guilty verdict. We hold that the defendant waived any error which might have occurred.

5. Appellant contends that a conspiracy cannot be proven by a single transaction between buyer and seller. This rule has only been applied in two situations, neither of which are present in this case. The first situation is where the buyer and seller are the only participants in the conspiracy. "Wharton's Rule" states that "an agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." 1 R. Anderson, Wharton's Criminal Law & Procedure 191 (1957). This rule does not apply where there is more than one seller or more than one buyer. *United States v. Rueter*, 536 F.2d 296 (9th Cir. 1976); *Gebardi v. United States*, 287 U.S. 112, 122 n.6, 53 S.Ct. 35, 38 n.6, 77 L.Ed. 206 (1932). The

second and more frequent application of the single transaction rule occurs when courts are compelled to grapple with the difficult problem of whether, in a particular case, it is fair to hold the buyer or a minor participant to be a part of a larger conspiracy consisting often of smugglers, distributors, middlemen, and other buyers. In those cases the question is whether the buyer or minor participant had knowledge of the scope of the conspiracy. We see no fairness issues presented where the defendant is a seller who naturally knows that he is dealing with a buyer even if he does not know the name of the party who is making the purchase.

6. *See generally, United States v. Vinson*, 606 F.2d 149 (6th Cir. 1978).

The jury, consisting of twelve regular jurors and one alternate, was selected on Tuesday, October 10, 1978. After the jury had been selected, the government made its opening statement and the first witness began to testify. At the end of the day, the trial was adjourned until Thursday, October 12, 1978. Prior to the commencement of the morning session on Thursday, the alternate juror informed the Court that when he returned to work on Wednesday he had been told that he would not be paid for the time spent on jury duty. This, said the alternate juror, would be a financial hardship for him. He asked to be excused. Although the record is not entirely clear at this point, it appears that the District Court consulted with counsel and then told the alternate juror, that when the Court convened, he would be excused. Later, when the Court finally did convene, the alternate was excused without objection of counsel for either side.[7]

That same morning, one of the regular jurors was an hour late in arriving at the courthouse. When she did arrive, the Court questioned her in the presence of counsel as to why she was late. During this questioning it became apparent that the juror had some mental problems. She seemed extremely nervous, she was unable to understand and answer simple questions and she seemed to have a poor memory. No one suggested, however, that she should be examined by a physician in order to determine her mental competency.

While both the Judge and the government attorney felt that the juror was not qualified to sit, defense counsel specifically objected to a mistrial or proceeding without the juror. When asked by the Court why he did not want a mistrial declared, defense counsel stated:

MR. WILLIAMS: Because we put it on the record that we don't feel the mentation of this juror is so bad that she could not understand or comprehend what's being said to her, and I think that she's excitable, frightened because she was late and this made her somewhat defensive, but I don't think that she's so crazy that she can't understand what's going on here.

THE COURT: All right.

MR. WILLIAMS: We've put that on the record, and since we're willing to accept this juror and proceed with this juror, and we also put that on the record, then I think that's our position, and that's where we stand at this point in time.

The District Judge offered the defendant three choices: a mistrial could be declared by agreement of the parties and a whole new panel of jurors selected, the woman juror could be excused and the trial could proceed with eleven jurors, or the defendant could proceed with the original panel of jurors including the woman juror. The District Court recommended to the defendant that a mistrial be declared, however, after consulting together, the defendant and his counsel both indicated to the Court that they desired to proceed with the original panel of jurors including the juror which the Court felt was not qualified to sit.[8] After this discussion took place, the morn-

---

7. We held in *United States v. Gay*, 522 F.2d 429, 435 (6th Cir. 1975) that the trial court has discretion to "dismiss a juror and replace him with an alternate, or dismiss an alternate for illness, hardship or other cause" without the consent of the parties, but that the Court must allow the defendant an opportunity to object and to make a record of the proceedings for purposes of preserving his right to appeal the decision. Absent an objection to the dismissal of a juror, any error which might have occurred is waived. *United States v. Davis*, 608 F.2d 698, 699 (6th Cir. 1979).

8. THE COURT: I would recommend it, yes, I wanted to declare a mistrial in this case and then pick another jury, or, as far as I'm—you can't very well proceed with a part of this jury because we've taken some testimony in this case and every juror has to hear all of the testimony.

Now, you're entitled to a jury of twelve; I have no objection to that, of course, but it was suggested that we proceed with eleven jurors, and we could discharge this woman and proceed with the remaining jurors if you would want to, if you elect to do it that way.

DEFENDANT RENFRO: I would prefer—

THE COURT: (Interposing) What?

DEFENDANT RENFRO: I would prefer twelve.

\*  \*  \*  \*  \*  \*

ing session commenced and the alternate juror was formally dismissed without objection. The alternate juror then left the courtroom. At the end of the day's testimony, the Court again asked on the record whether the defendant had reconsidered his position and desired a mistrial. Both the defendant and his counsel again indicated that they wished to continue with the same jury.[9] Now, after the incompetent juror voted to convict, the appellant argues that the District Court should have retained the alternate juror and substituted him for the incompetent juror. He also objects to the fact that this was not one of the alternatives offered to him by the Court.

■■■ A defendant can waive his right to trial by twelve jurors. *United States v.*

THE COURT: In my opinion you have one juror here who is not qualified to be a juror, but if you insist on it we'll go right ahead and decide this case with twelve jurors.
DEFENDANT RENFRO: No, I would not insist on the competency, if you want to call a mistrial and pick another jury it's O.K.
THE COURT: That is? All right, then you're agreeable that we declare a mistrial then?
MR. WILLIAMS: All right. Just a minute, your Honor, let me understand if he understands what he's doing.

\* \* \* \* \* \*

MR. WILLIAMS: Did I discuss with you what the Judge and I discussed in chambers prior to coming back in the courtroom and us going on the record?
DEFENDANT RENFRO: Yes, you did.
MR. WILLIAMS: No, the Judge in open court on the record has indicated to you that if you desire, not the Judge's desire, it's your desire, that he will declare a mistrial and pick a new jury because he feels there should be twelve competent jurors? Now, do you understand that?
DEFENDANT RENFRO: Yes.
MR. WILLIAMS: Now, nobody can force you to do this. I have informed and guided you with my counsel as your attorney of record. The Judge has indicated on the record what he will do. Now, do you want this jury of your own free will, or do you want a mistrial declared and pick another jury?
DEFENDANT RENFRO: No, we'll go with the same jury.
MR. WILLIAMS: You want to go with the same jury.
THE COURT: All right, bring in the jury. Now, wait just a second. I want to be absolutely sure, Mr. Williams and Mr. Renfro, that you do not want the Court to declare a mistrial. Is that right?

*Lane,* 479 F.2d 1134 (6th Cir.), *cert. denied,* 414 U.S. 861, 94 S.Ct. 78, 38 L.Ed.2d 112 (1973); Fed.Rules Cr.Proc., rule 23(b). We believe that a defendant may also waive his right to challenge the competency of a juror. *United States v. Witt,* 215 F.2d 580, 584–85 (2nd Cir.), *cert. denied, sub nom., Talanker v. United States,* 348 U.S. 877, 75 S.Ct. 207, 99 L.Ed. 697 (1954). Nor was it incumbent upon the Court to suggest all of the available alternatives. In a similar case the Ninth Circuit in *Delgado v. United States,* 403 F.2d 208, 209 (1968), *cert. denied,* 394 U.S. 966, 89 S.Ct. 1320, 22 L.Ed.2d 568 (1969), held:

Appellant asserts that the venireman in question was aware that appellant's coun-

MR. WILLIAMS: That is correct, your Honor.
THE COURT: Is that correct—
MR. WILLIAMS: (Interposing) Is that correct, Mr. Renfro?
DEFENDANT RENFRO: That's correct.
THE COURT: All right.

9. THE COURT: Shut the jury room door. I'd like to inquire once more now about this Juror No. 1. I made a record of what has occurred here in court and in my chambers with respect to Juror No. 1, the reason for her being tardy this morning, and I had stated my opinion that I think that this juror is not competent to be a juror in this case or any other case, and yet I think on the record as it now stands I have no right to excuse her as a juror or no right to declare a mistrial on my own motion, and I think, however, it would be better in the interest of justice for both the Government and the defendant to have a mistrial but, of course, I can't declare a mistrial, I don't feel I can, I don't think I have the right on the record as it now stands without some medical testimony about this juror, to declare a mistrial, so I just want to be absolutely sure that this defendant desires—does not desire to have the Court declare a mistrial and desires to have this case proceed with jury.
MR. WILLIAMS: He wishes to continue, your Honor.
THE COURT: I want to hear that from the defendant also. Is that right, Mr. Renfro?
DEFENDANT RENFRO: Yes, sir.
THE COURT: What?
DEFENDANT RENFRO: Yes, sir.
THE COURT: All right, we'll continue. We'll adjourn then until tomorrow morning at 9:30.

sel intended to challenge him peremptorily, and his retention on the panel was therefore prejudicial to appellant. He argues that in stating the possible course of action which might be taken after the error was discovered the court failed to include the replacement of this juror with the alternate juror. It is not at all clear from the record that the venireman was aware that appellant intended to challenge him peremptorily, as appellant asserts. But if it were, we think the burden rested upon the appellant to suggest the alternative which he now proposes if he preferred it to those suggested by the court. There is nothing to indicate that appellant's solution would not have been acceptable to the court.

We think the initial error was one which appellant could waive, and that waiver is established on the face of the record.

The judgment of conviction is affirmed.