**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 12, 2002**

Charles R. Fulbruge III
Clerk

REVISED DECEMBER 13, 2002

In the

# United States Court of Appeals
## for the Fifth Circuit

———————————

m 02-20887

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ROBERT NICHOLAS ANGLETON,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Before SMITH, BARKSDALE, and
EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Robert Angleton was acquitted, in state court, of the murder of his wife. A federal grand jury then indicted him for the same murder. Angleton appeals, on grounds of double

jeopardy, the denial of his motion to dismiss the indictment. Concluding that the dual sovereignty doctrine permits a successive prosecution, we affirm.

## I.

In April 1997, Doris Angleton was shot to death in her Houston home. At the time, she was seeking a divorce from her husband, Robert Angleton, a local bookmaker and police informant.

An investigation led police to suspect that Roger Angleton, Robert's brother, was involved. Police developed evidence showing that shortly before the murder, Roger had traveled from his home in San Diego, California, to Houston, where he used various aliases to register in different hotel rooms and rent two cars. A few days after the murder, he abandoned a suitcase containing two guns at an airport security checkpoint. He was arrested in Las Vegas, Nevada, on unrelated California warrants.

Both brothers were held on suspicion of the murder, and in October 1997 a Texas grand jury returned separate indictments against the two for capital murder. The indictments alleged that Robert had promised to pay Roger money in exchange for Doris's murder. While awaiting trial in jail, Roger committed suicide, leaving behind a handwritten note professing that he alone was responsible for the murder.

A state petit jury acquitted Robert Angleton of capital murder. Six months later, FBI agents began investigating him for separate offenses stemming from his bookmaking activities, including tax evasion. The Harris County District Attorney's Office then contacted the United States Attorney's Office, requesting that it expand the investigation to include Doris's murder.

A joint task force of FBI agents and Houston Police Department ("HPD") officers was formed to investigate the murder. The task force received all the information and evidence previously gathered for the state prosecution. The three lead HPD investigators were deputized as United States Marshals, still on the city payroll, so they would have access to files. The two assistant district attorneys who prosecuted Angleton in the state trial also assisted the task force. As part of the investigation, FBI agents interviewed members of the jury that had acquitted Angleton.[1]

In January 2002, a federal grand jury indicted Angleton on three counts. In counts 1 and 2, the indictment charges Angleton with murder for hire and conspiracy to commit murder for hire, both in violation of 18 U.S.C. § 1958(a), which prohibits interstate travel or the use of instrumentalities of interstate commerce "with intent that a murder be committed in violation of the laws of any State" in exchange for consideration. Count 3 charges Angleton with using a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).

After an evidentiary hearing, the district court found Angleton unable to establish a *prima facie* case of double jeopardy and denied his motion to dismiss the indictment. *United States v. Angleton*, 221 F. Supp. 2d 696 (S.D. Tex. 2002). After determining, however, that Angleton's arguments are not frivolous, the

---

[1] The joint task force has received one piece of new evidence, a tape recording of an interview Angleton gave to a writer, Vanessa Leggett. In addition, federal investigators contend that they have enhanced the quality of a surveillance tape of Angleton that was used at the state trial.

court stayed its proceeding pending the outcome of this interlocutory appeal. We have jurisdiction over an appeal, on nonfrivolous grounds of double jeopardy, of an order denying a motion to dismiss an indictment. *Abney v. United States*, 431 U.S. 651, 657-62 (1977).

## II.

No person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. AMEND. V. Double jeopardy concerns are implicated where a defendant is retried for the same offense following acquittal. *Illinois v. Vitale*, 447 U.S. 410, 413-15 (1980). Determining whether two offenses are the same offense for purposes of the Double Jeopardy Clause focuses on their statutory elements. We need not decide, however, whether the federal prosecution of Angleton constitutes double jeopardy, because we conclude that no exception to the dual sovereignty doctrine applies to this case in such a way as to call the federal indictment into question.[2]

## III.

The dual sovereignty doctrine permits the United States to "prosecute a defendant after an unsuccessful state prosecution based on the same conduct, even if the elements of the state and federal offenses are identical."[3] Angleton nevertheless argues that the dual sovereignty doctrine "relies on a rigid adherence to a premise that is no longer tenable: that state and federal prosecutors always pursue different interests as separate and distinct sovereigns." He contends that the rise of cooperative federalism and the incorporation of the Double Jeopardy Clause through the Fourteenth Amendment have eroded the foundations of the dual sovereignty doctrine.

## A.

The dual sovereignty doctrine derives from the common law notion that a crime is an offense against the sovereign.[4] "When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offenses.'" *Heath*, 474 U.S. at 87. As a sovereign,[5] the United States "has the right to decide that a state prosecution has not vindicated a violation of the 'peace and dignity' of the federal government." *Id.* at 93. The dual sovereignty doctrine is best understood, then, *not* as an exception to dou-

---

[2] *See, e.g.*, *United States v. Basile*, 109 F.3d 1304 (8th Cir. 1997) (holding that the dual sovereignty doctrine permits a successive federal prosecution after a state acquittal, without addressing whether the underlying state murder charge and § 1958(a) constitute the same offense for purposes of double jeopardy); *United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994) (applying dual sovereignty doctrine without addressing whether state charges of assault with a deadly weapon and excessive use of force by a police officer were the same offenses, for double jeopardy purposes, as the deprivation of constitutional rights, 18 U.S.C. § 242).

[3] *United States v. Avants*, 278 F.3d 510, 516 (5th Cir.) (citing *Heath v. Alabama*, 474 U.S. 82, 93 (1985)), *cert. denied*, 122 S. Ct. 2683 (2002).

[4] Note, Popular Sovereignty, Double Jeopardy, and the Dual Sovereignty Doctrine, 102 YALE L.J. 281, 290 (1992).

[5] *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 410 (1819) ("[In] America, the powers of sovereignty are divided between the government of the Union, and those of the States. They are each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other.").

3

ble jeopardy, but rather as a manifestation of the maxim that where a defendant violates the laws of two sovereigns, he commits separate offenses.[6]

The Supreme Court directly embraced the doctrine for the first time in *United States v. Lanza*, 260 U.S. 377, 382, recognizing that "in determining what shall be an offense against its peace and dignity [, each sovereign] is exercising its own sovereignty, not that of the other." *Id.* at 382. Before *Lanza* was decided, several nineteenth century opinions illustrated that even before the rise of modern "cooperative federalism," *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55 (1964), there was concurrent regulation.[7] Until *Lanza*, however, the Court was faced only with *threats* of successive state-federal prosecutions.

Two 1959 Supreme Court decisions bolstered *Lanza* and helped shape the modern view of the dual sovereignty doctrine as a mainstay of federalism. In *Bartkus v. Illinois*, 359 U.S. 121 (1959), the Court decided that a successive state robbery prosecution following an acquittal under the federal robbery statute did not deny due process. Key to the decision was the inapplicability of the Fifth Amendment to the states, *id.* at 123-29, a point reiterated in another decision decided the same day, *Abbate v. United States*, 359 U.S. 187, 194 (1959).[8]

In *Heath*,[9] 474 U.S. at 88, the Court recognized that in assessing the validity of the dual sovereignty doctrine, the "crucial determination is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns." Where the dual sovereignty doctrine has been found inapplicable, it is because "the two prosecuting entities did not derive their powers to prosecute from independent sources of authority."[10] *Id.* at 90. The *Heath* Court

---

[6] *See Heath*, 474 U.S. at 92 ("This Court has plainly and repeatedly stated that two identical offenses are *not* the 'same offence' within the meaning of the Double Jeopardy Clause if they are prosecuted by different sovereigns."); *United States v. Lanza*, 260 U.S. 377, 382 (1922) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."); *Moore v. Illinois*, 55 U.S. (14 How.) 13, 20 (1852) ("The same act may be an offence or transgression of the laws of [Illinois and the United States] . . . . That either or both may (if they see fit) punish such an offender, cannot be doubted.").

[7] *See Moore v. Illinois*, 55 U.S. (14 How.) 13 (1852); *United States v. Marigold*, 50 U.S. (9 How.) 560 (1850) (discussing the concurrent power of the federal and state governments to punish counterfeiting); *Fox v. Ohio*, 46 U.S. (5 How.) 410 (1847) (same); *Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820) (addressing state statute that punished militiamen who failed to answer the President's call to service).

[8] *Abbate*, 359 U.S. at 188-89, upheld a successive federal prosecution for the destruction of property where defendants had been acquitted in state court. The *Abbate* Court explicitly refused to overrule *Lanza*. *Id.* at 195.

[9] *Heath* applied the dual sovereignty doctrine to a case involving successive prosecutions by two states. There is no authority suggesting that its holding is less relevant in other contexts, such as successive state-federal prosecutions.

[10] For example, successive prosecutions by federal and territorial courts are barred, *Puerto Rico v. Shell Co.*, 302 U.S. 253, 264 (1937), as are successive prosecutions by municipalities that derive their power to try defendants "from the same or-
(continued...)

4

explicitly rejected the notion that applicability of the dual sovereignty doctrine should hinge on an assessment of the separate sovereigns' interests. *Id.* at 92. Rather, if the prosecuting sovereigns are separate, "the circumstances of the case are irrelevant." *Id.*

### B.

Angleton points out that, since *Lanza* was decided, the United States has assumed an increased role in the enforcement of criminal law. The dual sovereignty doctrine, however, has never required that where there is concurrent regulation, the United States or a state must demonstrate a unique interest not shared by the other. *Heath*, 474 U.S. at 92.

Angleton also accurately observes that *Bartkus* and *Lanza* were decided before the Double Jeopardy Clause was first applied to the states in *Benton v. Maryland*, 395 U.S. 784 (1969). The legal foundations of the dual sovereignty doctrine, however, have been firmly rooted in the notion that "[t]he same act may be an offence [*sic*] or transgression of the laws" of two separate sovereigns. *Bartkus*, 359 U.S. at 131 (quoting *Moore*, 55 U.S. (14 How.) at 20).

Angleton's argumentSSthat incorporation of the Fourth and Fifth Amendments has led the Court to reconsider the constitutionality of other previously authorized practices in which cooperating state and federal prosecutors accomplished what the federal government was unable to do independentlySSis unavailing. Angleton cites the overruling, in *Elkins v. United States*, 364 U.S. 206 (1960), of the "silver platter doctrine," a practice that, before

the incorporation of the Fourth Amendment, permitted federal authorities to use evidence obtained illegally by state authorities. In *Elkins*, the Court reasoned that evidence seized illegally by one sovereign could not be turned over to another sovereign, because "[t]o the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." *Id.* at 215.[11]

The dual sovereignty doctrine, however, exists independently of any interaction between sovereigns; either may prosecute independently to vindicate its own interests. The Supreme Court has said, as recently as *Heath,* that the doctrine remains good law.[12] We therefore turn to Angleton's argument that a successive federal prosecution is barred by exceptions to the dual sovereignty doctrine.

### IV.

Angleton contends that two exceptions to the dual sovereignty doctrine bar his federal prosecution. He first argues that the nature and extent of the state officials' involvement in his federal indictment justify application of the "sham prosecution" exception. Second, relying on language in *Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820), he contends that the federal murder for hire statute's

---

[11] *See also Murphy*, 378 U.S. at 77 (overturning the previously authorized rule that, before incorporation of the Self-incrimination Clause of the Fifth Amendment, compelled self-incrimination could be used by a sovereign different from the one obtaining the confession).

[12] *See United States v. Singleton*, 16 F.3d 1419, 1429 n.48 (5th Cir. 1994) ("Even if the constitutionality of the 'dual sovereignty doctrine' were properly before us . . . we are bound by Supreme Court precedent upholding the doctrine." (citing *Heath*, 474 U.S. 82 (1985))).

---

[10](...continued)
ganic law that empowers the State." *Waller v. Florida*, 397 U.S. 387 (1970).

incorporation of the Texas capital murder statute leaves his prosecution without an independent federal interest.

### A.

In *Bartkus*, 359 U.S. at 123-24, the Court suggested, in *dictum*, that there is an exception to the dual sovereignty doctrine where prosecution by one sovereign is used as a cover or tool for a successive prosecution by another sovereign. In such a case, collusion between federal and state officials might blur their distinction such that the defendant is "effectively prosecuted twice by the same sovereign." *United States v. Harrison*, 918 F.2d 469, 474 (5th Cir. 1990).

The *Bartkus* Court's failure to identify a particular instance of a sham prosecution may mean that the exception does not exist. *Id.*; *United States v. Patterson*, 809 F.2d 244, 247 n.2 (5th Cir. 1987). Indeed, the close interaction between federal and state authorities in *Bartkus*, which included the federal prosecutor's decision to "instigate and guide" the successive state prosecution, suggests that the sham exception exists, if at all, only in the rarest of circumstances. *Bartkus*, 359 U.S. at 165 (Brennan, J., dissenting).[13] In cases in which we have recognized the exception as a possible bar to a successive prosecution, we have never found sufficient collusion to justify its application.[14]

For evidence that the federal prosecution is a sham, Angleton points to the involvement of state authorities in the process leading to the federal indictment. He argues that the federal government's failure to investigate the murder until contacted by the Harris County District Attorney, and the three and one-half year gap between the state acquittal and federal indictment, demonstrate a lack of federal interest. In addition, Angleton claims that the formation of a joint federal-state task force, the deputizing of HPD officers as U.S. Marshals, and the interviewing of state jurors suggest that the federal prosecution is merely an avenue for the state to retry the case.

The key, however, is whether the separate sovereigns have made independent decisions to prosecute,[15] or whether, instead, "one sovereign has essentially manipulated another

---

[14](...continued) 664, 676 (5th Cir. 1995) (rejecting claim that state authorities purposely failed to include charges later reported to federal prosecutors); *United States v. Moore*, 958 F.2d 646, 650 (rejecting claim that successive prosecution was a sham where defendant had committed separate offenses against a federal and state officer); *United States v. Cooper*, 949 F.2d 737, 750-51 (5th Cir. 1991) (finding no sham prosecution where there was a short time between a mistaken release from state custody and a federal indictment).

[15] *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1361 (11th Cir. 1994) ("To fit within the [sham prosecution] exception, the defendant must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition."); *In re Kunstler*, 914 F.2d 505, 517 (4th Cir. 1990) (stating that the sham prosecution exception "may only be established by proof that State officials had little or no independent volition in their proceedings") (citation omitted).

---

[13] *See United States v. Figueroa-Soto*, 938 F.2d 1015, 1019 (9th Cir. 1991) ("As a practical matter, . . . under the criteria established by *Bartkus* itself it is extremely difficult and highly unusual to prove that a prosecution by one government is a tool, a sham or a cover for the other government.").

[14] *See, e.g.*, *United States v. McKinney*, 53 F.3d (continued...)

6

sovereign into prosecuting," *United States v. G.P.S. Auto. Corp.*, 66 F.3d 483, 495 (2d Cir. 1995), or because the state and federal prosecutor are the same person, *United States v. Belcher*, 762 F. Supp. 666, 671 (W.D. Va. 1991). The facts of *Bartkus* demonstrate that the degree of cooperation between federal and state authorities cannot, by itself, constitute a sham prosecution.

### B.

Angleton contends that *Bartkus* defined an additional class of successive federal-state prosecutions in which the dual sovereignty doctrine is inapplicable. He relies on language from *Houston*, 18 U.S. (5 Wheat.) 1, later interpreted in *Bartkus*, for the proposition that "where one sovereign is derivatively enforcing a statute of the other by explicitly incorporating it as a central element of an offense," a successive prosecution by the enforcing sovereign is barred. Angleton correctly notes that § 1958(a) incorporates the Texas capital murder statute.[16] He argues that the attempt of the United States derivatively to enforce the state statute dictates the

conclusion that the sovereigns do not have "independent and separate interests."

In *Houston*, the Court reviewed the constitutionality of a Pennsylvania statute that derivatively enforced a federal statute by providing sanctions for members of the state militia who failed to answer the President's call to service. The Court stated, in *dictum,* that if the federal and state military tribunals exercised concurrent jurisdiction, the former prosecution might be pleaded in bar of the other. *Id.* at 31-32. In *Bartkus*, however, the Court, 359 U.S. at 130, stated that *Houston* could be cited "only for the presence of a bar in a case in which the second trial is for a violation of the very statute whose violation by the same conduct has already been tried in the courts of another government empowered to try that question."[17]

Because *Houston* involved neither successive prosecutions nor a discussion of the dual sovereignty doctrine, its continual relevance is, to say the least, questionable. Moreover, Angleton's argument——that a sovereign derivatively enforcing the statute of another sovereign lacks an independent interest sufficient to justify its successive prosecution——was rejected in *Heath*, 474 U.S. at 82, in which the Court disavowed the "uncertain balance of interests approach," *id.* at 92.

---

[16] The federal murder for hire statute states in relevant part:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed *in violation of the laws of any State* or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so . . . .

18 U.S.C. § 1958(a) (emphasis added).

[17] Angleton also cites *United States v. Mason*, 213 U.S. 115 (1909), in support of his argument that a sovereign cannot derivatively enforce the statute of another sovereign in a successive prosecution. Like *Houston*, *Mason* is "neither a double jeopardy nor a collateral estoppel holding." *United States v. Frumento*, 563 F.2d 1083, 1087 (3d Cir. 1977).

Moreover, the United States is not seeking to enforce the state statute under which Angleton was acquitted. Instead, Congress has criminalized interstate activities involving murder for hire. Because Congress has acted within constitutional bounds, *United States v. Marek*, 238 F.3d 310, 321 (5th Cir.) (en banc), *cert. denied*, 534 U.S. 813, *and cert. denied*, 534 U.S. 813 (2001), it is free to define the crime as it deems proper, *United States v. Kozminski*, 487 U.S. 931- 939 (1989), including the derivative use of borrowed statutes.

V.

Angleton reasons that § 1958(a) should be interpreted as requiring the United States to demonstrate a "substantial federal interest" before bringing a successive federal prosecution of an acquitted state murder for hire charge. He contends that in enacting § 1958(a), Congress "anticipated the grave federalism concerns raised by a successive prosecution under the statute by indicating an intent to reserve *any* federal prosecution . . . to cases raising substantial federal interests."

Angleton's argument is tantamount to urging an adoption of the Department of Justice's "*Petite* policy," which permits federal prosecutors to obtain authorization to bring a federal prosecution following a state prosecution for the same underlying conduct, where the state proceeding has left "substantial federal interests demonstrably unvindicated." *United States v. Jones*, 808 F.2d 561, 565 (7th Cir. 1986). As Angleton concedes, the *Petite* policy is not constitutionally mandated, because "the Constitution does not prohibit successive state-federal prosecutions." *United States v. Nelligan*, 573 F.2d 251, 254 (5th Cir. 1978) (citing *Rinaldi v. United States*, 434 U.S. 22, 28 (1977)).

So far as Angleton's argument can be interpreted as requiring a substantial federal interest to keep § 1958 within the scope of the Commerce Clause, it is also foreclosed. We recently confirmed the constitutionality of § 1958(a) in *Marek*, 238 F.3d at 320, interpreting the statute broadly to allow even *intrastate* use of a facility of interstate commerce.

VI.

Angleton argues that collateral estoppel prevents the empaneling of a federal jury to decide factual questions already determined by a state jury. Collateral estoppel, or issue preclusion, requires that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the *same parties* in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970) (emphasis added). Collateral estoppel is inapplicable here, because the United States and Texas, as separate sovereigns, are not the "same party."

In *Ashe,* the Court held that collateral estoppel is embodied in the Double Jeopardy Clause. *Id.* at 445. Because that clause does not bar the United States from prosecuting a defendant for the same conduct after an unsuccessful state prosecution, and because collateral estoppel is embodied in the clause, collateral estoppel does not bar Angleton's successive federal prosecution. Because two sovereigns are permitted to prosecute for the same crime, "it would be anomalous, indeed, if a sovereign were allowed the greater power of reprosecuting individuals for offenses for which they had been acquitted but were denied the lesser power of proving the underlying facts of such offenses." *United States v. Tirrell*, 120 F.3d 670, 676 (7th Cir. 1997).

The order of the district court, denying An-

gleton's motion to dismiss the indictment, is AFFIRMED, and this matter is REMANDED for further appropriate proceedings. As the government requests, in the interest of expediting this matter, the mandate shall issue forthwith.