RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DALE MARDIS,

*Defendant-Appellant.*

No. 09-5696

———————————

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 08-20021-001—Bernice B. Donald, District Judge.

Argued: March 10, 2010

Decided and Filed: March 31, 2010

Before: MARTIN, SILER, and MOORE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Howard B. Manis, MANIS & SALOMON, PC, Memphis, Tennessee, for Appellant. April J. Anderson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Howard B. Manis, MANIS & SALOMON, PC, Memphis, Tennessee, Blake Ballin, BALLIN BALLIN & FISHMAN, PC, Memphis, Tennessee, for Appellant. Linda F. Thome, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge. Dale Mardis appeals the district court's denial of his motion to dismiss the federal indictment brought against him. The motion alleged a violation of the Double Jeopardy Clause of the Fifth Amendment because the federal indictment was brought subsequent to his entering a nolo contendere plea in a Tennessee state court on a related charge. He argues that the dual sovereignty doctrine must

be re-examined as federal and state authorities have become so intertwined that they are functionally indistinguishable as separate sovereigns. Alternatively, he argues that the federal prosecution should be barred under the "sham prosecution" exception to dual sovereignty and that public policy requires that the indictment be dismissed.

For the reasons set forth below, we **AFFIRM** the decision of the district court.

## I.

In 2001, a federal grand jury in the Western District of Tennessee convened to investigate the disappearance of Mickey Wright, a Memphis and Shelby County Codes Enforcement Officer. A task force comprised of federal and local law enforcement agencies uncovered evidence indicating that Wright disappeared on April 17, 2001, and that his last known location was on property owned by Mardis in Memphis, where Wright appears to have written a "courtesy" citation. Wright's burned-out truck, badge, and identification card were found in Mississippi; his body was not recovered.

The 2001 federal grand jury, which heard evidence on charges of arson of a motor vehicle, interstate transportation of a vehicle, and a firearms charge, ultimately did not return charges against any individual, though Mardis was called to testify. The matter was further investigated by state authorities while federal prosecutors held in abeyance additional efforts to investigate potential federal charges. However, the federal prosecutors did not formally close their investigation into Wright's disappearance. After its investigation, the State of Tennessee indicted Mardis for first degree murder and sought the death penalty. Mardis was represented in state court by attorney Howard Wagerman. The state's lead prosecutor was Assistant District Attorney General Tom Henderson. In the week before Mardis' state court trial, Wagerman and Henderson discussed a possible plea deal and reached a tentative agreement whereby Mardis would plead nolo contendere to second degree murder, inform the state as to what happened to Wright's body, and serve the entirety of a sentence of 13.5 years' incarceration.

Wishing to resolve all potential charges at the same time, Wagerman contacted Assistant U.S. Attorney Jennifer Webber and inquired if there were any pending federal charges that might be brought against Mardis. She indicated to Wagerman that she

possessed a case report relating to a contemplated, but not yet initiated, federal firearms charge.  As a result of Wagerman's inquiry, Webber called Henderson to ask if he would like her to request an agreement from her supervisor to add to Mardis' state plea agreement that the federal government would not prosecute this federal firearms charge if the state's plea agreement increased the sentence.  Henderson indicated that he was interested, and the federal government subsequently agreed that the federal firearms charge would be resolved if Mardis agreed to an increased sentence of 15 years.

Mardis agreed, and on April 5, 2007, Mardis entered a nolo contendere plea to the charge of second degree murder in the Criminal Court for Shelby County.  He was sentenced to 15 years in prison with a stipulation that he serve the entire sentence.  Wagerman wrote a note giving the location of Wright's remains, which does not mention how this information was obtained, to fulfill the plea agreement.

A subsequent federal investigation commenced under the lead of Joe Everson, a Shelby County Sheriff's Deputy and a Special Deputy United States Marshal.  Henderson turned over his file on the Mardis case to the U.S. Attorney's Office, and Everson was assigned as a liaison to the federal investigation.  A second federal grand jury was impaneled and returned an indictment against Mardis on January 30, 2008, for a civil rights murder in violation of 18 U.S.C. § 245, as well as for using a firearm to accomplish the murder in violation of 18 U.S.C. § 924(j).  According to the pending federal indictment, Mardis murdered Wright on account of the victim's race and color (Wright was African-American and Mardis is Caucasian) as well as the victim's employment by a governmental entity.  On or about March 3, 2008, the federal government filed a notice of certification to prosecute Mardis under the civil rights statute, 18 U.S.C. § 245.

Mardis moved to dismiss the indictment on the ground that it violated the Fifth Amendment's ban on double jeopardy.  On June 24, 2008, the district court denied the motion.  *United States v. Mardis*, No. 08-20021 (W.D. Tenn. June 24, 2009).  The court first declined to reconsider the validity of the dual sovereignty doctrine, finding it to be well-established in federal case law.  The court then found that the dual sovereignty doctrine applied in this case because it was Mardis' counsel who had involved the U.S. Attorney's Office in plea negotiations and the federal government had not entered into a non-

prosecution agreement.  The court then concluded that the "sham" exception to the dual sovereignty doctrine did not apply because "the federal government did not intervene into the state's prosecution to such an extent as to make the state's prosecution of [Mardis] a sham."  (June 24, 2009 Order at 7.)

The district court then found that the state court plea agreement did not preclude a federal prosecution because, based upon the testimony of both Wagerman and Webber, Webber's "involvement in the plea negotiations was limited to the distinct issue of the federal gun case.  She did not discuss disposing of all possible federal charges that might be brought against [Mardis] in the future."  *Id.*  As the federal government did not prosecute the federal firearms offense, the district court found that the state plea agreement did not bar the latest federal prosecution.

Finally the district court found that the federal indictment does not violate the Department of Justice's *Petite* policy, which guides federal prosecutors' decision on whether to prosecute a defendant "based on substantially the same act(s) or transactions involved in a prior state or federal proceeding."  *Id.* (citing United States Attorneys' Manual, § 9-2.031 (1997)).  The court found that the *Petite* policy applies only to prosecutions, not to investigations, and that, as the policy permits "successive or dual prosecutions such as in the instant matter when federal interests have not been vindicated," *id.* at 10, the government did not violate the policy.  The court found that the policy "is not constitutionally mandated and confers no rights upon the accused."  *Id.*  Mardis timely appealed.

## II.

### A.     Standard of Review

We review de novo a denial of a motion to dismiss on double jeopardy grounds. *United States v. DeCarlo*, 434 F.3d 447, 452 (6th Cir. 2006).  To the extent that the district court made factual findings following an evidentiary hearing, those findings may be overturned only if they are clearly erroneous.  *Id.*

## B.    The Dual Sovereignty Doctrine and Sham Prosecutions

The Double Jeopardy Clause states that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V. Usually, prosecution in both state court and federal court for offenses that would otherwise constitute the same "offense" under the Fifth Amendment if tried successively in the same forum is constitutional under the dual sovereignty doctrine. *Heath v. Alabama*, 474 U.S. 82, 88-89 (1985). "The dual sovereignty doctrine holds that the double jeopardy clause does not apply to suits by separate sovereigns, even if both are criminal suits for the same offense." *United States v. Louisville Edible Oil Prods., Inc.*, 926 F.2d 584, 587 (6th Cir. 1991) (citation and internal quotation marks omitted).

Mardis first argues that the dual sovereignty doctrine itself should be reexamined in light of increases in inter-jurisdictional cooperation. However, as there is no basis on which we could embark upon a re-examination of "the legitimacy of the doctrine's rigid application in light of the modern criminal justice system" as Mardis requests, we decline the invitation.

Mardis also argues that the "sham prosecution" exception to the dual sovereignty doctrine applies in his case because "the actions of the federal and state authorities . . . are so intertwined that they are indistinguishable as separate sovereigns." The Supreme Court suggested a very limited exception to the dual sovereignty doctrine in *Bartkus v. Illinois*, 359 U.S. 121 (1959), in the context of finding that a state prosecution for the same crime upon which the defendant had been acquitted in federal court was constitutional under the Fifth Amendment, as made applicable to the states under the Fourteenth Amendment. *Id.* at 123. In *Bartkus*, the defendant was tried and acquitted by a federal court and a state grand jury indicted him for the same conduct less than a month later. After the federal acquittal, federal investigators turned over their evidence and evidence acquired after the acquittal to the state prosecutors. The federal court also delayed sentencing two accomplices until they had testified at the state trial. The Supreme Court held that this level of cooperation and coordination was "conventional practice between the two sets of prosecutors throughout the country" and that "[t]he state and federal prosecutions were separately conducted [and] that the prosecution was undertaken by state prosecuting officials within their discretionary

responsibility and on the basis of evidence that conduct contrary to the penal code of Illinois had occurred within their jurisdiction." *Id.* at 122-23. The Supreme Court articulated the "sham prosecution" exception in dicta:

> [The record] does not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal. It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

*Id.* at 123-24; *see also United States v. Deitz*, 577 F.3d 672, 686-87 (6th Cir. 2009) (citing *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984)).

While no court has found that cooperation between sovereigns in the investigation and the timing and planning of successive prosecutions of an individual for related offenses violates the dual sovereignty doctrine, it is not impossible that it could occur. One can imagine a situation in which Sovereign A failed to secure a conviction and therefore takes its evidence and charges to Sovereign B for another bite at the apple in a way that does constitute a sham prosecution. Such circumstances, in which Sovereign A pulls the strings of Sovereign B's prosecution, may indeed violate the Fifth Amendment's ban on double jeopardy.

Here, however, the cooperation and coordination was less than that which took place in *Bartkus*, which the Supreme Court found not to constitute a sham prosecution. The agencies cooperated substantially in their investigations of the crimes and appear to have coordinated the timing of their prosecutions. While federal and state authorities cooperated in the investigation of Wright's disappearance, this is an admirable use of resources that the courts have found not to be problematic. *See, e.g.*, *United States v. Angleton*, 314 F.3d 767, 774 (5th Cir. 2002) (holding that the facts that, after the defendant had been acquitted of murder charges in state court; (1) the district attorney's office itself had asked the U.S. Attorney's Office to investigate the case; (2) a joint task force of FBI agents and local police officers investigated the crime; (3) two state assistant district attorneys involved with the state prosecution assisted with the second federal investigation; and (4) FBI agents interviewed members of the state court jury that acquitted the defendant, did not defeat dual sovereignty).

Moreover, based on the record and the testimony of those involved, the state and federal prosecutions proceeded independently. There is neither evidence that the federal prosecutor manipulated the state prosecutor nor of the reverse; indeed, Henderson stridently denied that the U.S. Attorney's Office had manipulated his prosecution in any way, stating that "[i]f they had, I would have punched them out and turned them in in that order." (May 27, 2009 Tr. at 238.) As in *Bartkus*, there is no evidence that the prosecutions were not conducted separately.

Thus, the only remaining issue is the level of involvement of the U.S. Attorney's Office in the plea negotiations between the state and Mardis. Mardis claims that the "federal government deliberately interfered with the State prosecution's plea negotiations and agreement." Essentially, Mardis argues that when Webber became involved in the state plea agreement in any capacity, double jeopardy prohibited future federal claims arising from these facts.

However, the federal government was only involved at the explicit invitation of Mardis' attorney, who called Webber to ask about resolving federal charges against Mardis through the state plea agreement that he had already concluded with Henderson. It is disingenuous to suggest that the federal government's involvement in a state plea agreement was improper when the defendant himself invited the federal government to participate.

Mardis next claims that the federal government became involved in order to acquire a plea to second degree murder in the state court and a statement regarding the disposition of Wright's body. However, the plea and the statement from Mardis' attorney were elements of Mardis' state court plea agreement well before the involvement of the federal government in the plea negotiations. As the plea and the statement would have been available to a subsequent federal prosecution without federal involvement, it is highly implausible that the U.S. Attorney's Office became involved in order to acquire this information for their subsequent federal prosecution.

Finally, Mardis argues that Webber "intentionally misrepresented the existence of federal charges that could subsequently be brought against" him. However, the evidence on record does not support this interpretation of events. After Henderson and Wagerman reached an agreement on the state charges, Wagerman contacted Webber "to determine if

there were outstanding federal charges that could be disposed of as well." (June 24, 2009 Order at 6.) Wagerman testified that he did not ask Webber about a universal plea agreement because he knew that the federal government does not make them available. Instead, Webber said that he asked her if there were any pending charges and told her that he had previously called the clerk of court's office, so Webber believed him to be asking about both sealed and unsealed indictments against Mardis. Wagerman further testified that he and Webber "didn't go into [the question of whether the federal government would conduct a new investigation with new information] at all" and that he "wasn't concerned" about new information arising. (May 27, 2009 Tr. at 76.) Wagerman testified to his belief that Webber only mentioned the federal gun charge because that was all she anticipated at the time of the call, a belief supported by the record as the only charge recommended in the case report was a state charge of first degree murder. Webber testified that she knew of no evidence presented to the first grand jury regarding racial motivation and that the only charges under consideration when she spoke with Wagerman were interstate transportation of a motor vehicle and arson, and also a firearms charge, which the government chose not to pursue. Additionally, when speaking with Henderson about a potential change to the state plea agreement to take into account a federal charge, Webber asked Henderson whether he was interested in having her go to her supervisor about this offer. Thus, Webber did not mislead Wagerman or Mardis during her involvement in the state plea agreements and her actions did not undermine Henderson's freedom to prosecute Mardis in state court as he saw fit.

The facts of this case do not rise to the level of a "sham prosecution" so as to qualify for the exemption to the dual sovereignty doctrine.

### C.     Public Policy and the *Petite* Policy

Mardis argues, citing no authority, that public policy requires dismissal of the federal indictment. He suggests that permitting the federal prosecution "will undermine both the integrity of the federal government and public confidence in the federal criminal justice system." He further claims that he has a "right to have his trial completed by a particular tribunal" and to avoid the stress of a federal trial after having entered a plea specifically to avoid a state court trial, that his case is over-publicized, and that he would never have pled

nolo contendere had he known that he would be tried again in federal court. Essentially, he argues that the dual sovereignty doctrine is against public policy. As the doctrine is well-established federal law, this argument is unpersuasive.

Mardis further claims that the government violated its own *Petite* policy in choosing to prosecute him, which he contends constitutes a violation of due process. The *Petite* policy, which derives its name from *Petite v. United States*, 361 U.S. 529 (1960), provides: "No Federal case should be tried when there has been a State prosecution for substantially the same act or acts without a recommendation having been made (to and approved by) the Assistant Attorney General demonstrating compelling Federal interests for such prosecution." *United States v. Renfro*, 620 F.2d 569, 573 n.2 (6th Cir. 1980). As Mardis concedes, the *Petite* policy "is not constitutionally mandated and confers no rights upon the accused." *Id.* at 574 (citing *United States v. Frederick*, 583 F.2d 273 (6th Cir. 1978), *cert. denied*, 444 U.S. 860 (1979)). Thus, "the government is the only party with standing to assert the applicability of the Petite policy in seeking the dismissal of an indictment." *Id.* (citing *Rinaldi v. United States*, 434 U.S. 22 (1977); *Thompson v. United States*, 444 U.S. 248 (1980)).

Mardis argues that the government should not be able to "hide behind the Petite policy without having to explain whether it indeed followed its own internal policy." However, he cites no authority for this proposition. He also argues that because he pled nolo contendere and "accepted punishment without a jury trial," rather than pleading not guilty or pleading guilty, his situation is more complicated than most. But "[t]he decision of whether or not to prosecute . . . is a decision firmly committed by the [C]onstitution to the executive branch of the government." *Renfro*, 620 F.2d at 574. Therefore, "intervention by the court in the internal affairs of the Justice Department would clearly constitute a violation of the Separation of Powers Doctrine." *Id.* Additionally, the Supreme Court has specifically rejected a request that it abandon sovereignty analysis and instead balance the relevant interests to determine whether the Double Jeopardy Clause has been violated. *Heath*, 474 U.S. at 92. We may not reverse that decision here.

### III.

We therefore **AFFIRM** the decision of the district court.