NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0452n.06

No. 07-1919

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED
Jul 06, 2009
LEONARD GREEN, Clerk**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Plaintiff-Appellee,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| ILENE RUTH MOSES, | ) | **M E M O R A N D U M** |
| | ) | **O P I N I O N** |
| **Defendant-Appellant.** | ) | |

BEFORE: NORRIS, BATCHELDER, and KETHLEDGE, Circuit Judges.

**ALAN E. NORRIS, Circuit Judge.** Defendant Ilene Moses stands convicted of fifty-two

counts related to a long-term fraudulent enterprise. On appeal, she argues that the district court erred

1) by allowing the introduction of an exhibit by the government that consisted of charts which helped

the jury link substantive exhibits to the various counts of the indictment; 2) by declining to dismiss

the indictment; 3) by permitting a witness to testify about acts not related to the charges of the

indictment; and 4) by imposing an unreasonable sentence.  Finding no error, we affirm both the

conviction and sentence.

**I.**

This case has a long history.  In fact, over ten years elapsed between the initial indictment

and trial, which finally began in January 2007. A ninety-count second superseding indictment

charged defendant and four associates with various crimes related to fraudulent activity.[1] It is this

indictment that defendant sought to have dismissed. After her conviction, the district court

sentenced defendant, who is currently 72 years old, to 210 months of imprisonment and three years

of supervised release. It also ordered restitution in the amount of $15,978,060.00.

Although the underlying facts are extensive, a detailed knowledge of them is not required to

resolve the issues on appeal. For that reason, we rely on the summary provided by the pre-sentence

report for context:

> Beginning in the early 1970's, Ilene Moses owned and ran a woman's clothing business in Grosse Pointe, Michigan called SMS, Inc. This business manufactured and sold women's clothing within the United States. From 1979 to 1991, Moses, Lawrence Anderson, Kenneth C. Kazerski, Albert John Oldridge and Wayne Carrick were involved in a scheme to defraud and obtain loan money by means of false pretenses, representations, promises, and fictional financial statements from Michigan Bank (now LaSalle Bank), Swiss Cantonbank (International), and Security Bank of Michigan (now Huntington National Bank). The loss amounts were $14,103,971.00, $13,500,000.00 and $330,000.00, respectively, for a total loss of $27,933,971.00. Moses obtained these loans for the supposed purpose of carrying on the clothing business; she claimed that she had a lucrative deal for international clothing sales in Europe and Asia.
>
> In order to make their scheme work, the defendants used false financial statements, together with other false statements and documents, to deceive the banks into making loans to Ilene Moses and her companies, SMS, Inc., Jolland, and Ircon. There were various fictitious assets, of which the largest was the accounts receivables owed by Romtex, that ranged from $2.5 million to $90 million. Other fictitious assets included 300,000 yards of wool/cashmere cloth worth $2.65 million, a $2.5 million quota deposit held by American Service and Trading Corporation (ASTC), a $425,000.00 escrow deposit held by ASTC, a $3.9 million cash deposit held by

---

[1] Ultimately, defendant stood trial individually on the fifty-two counts of conviction. The government dismissed the remaining counts prior to trial. Her co-defendants entered into plea agreements (Kazerski and Carrick), cooperation agreements resulting in the dismissal of charges (Oldridge), or stood trial (Anderson).

Chathill, and a $100,000.00 per month income from Romtex for a license agreement for services from Moses.

The defendants also used shell companies; that is, companies with little or no assets to make their international business appear real. The shell companies included three in Switzerland (Ircon AG, Romtex AG, and The Leslie Jones Group), several in Hong Kong (Jolland Company, ASTC, Billion Up Enterprises, Nature Trading Company, and Chathill, Ltd.), and one in the Cayman Islands (Cathay American, Ltd.) The defendants made it appear that (1) the shell companies had millions of dollars in assets; (2) some of the shell companies were doing millions of dollars of business with SMS and Jolland in the international textile industry; and (3) the shell companies were independent of Ilene Moses, and, therefore, were able to satisfy accountants that the supposed business was real, when in fact, Moses or her co-defendants controlled the shell companies.

The main part of the fraud worked in the following manner: Romtex was controlled by Moses. However, Anderson and the others presented Romtex as being under the control of a secret international clothing cartel, a cartel so secret that no information about it could be revealed to the banks or to the accountants for Moses and her companies. Moses, Anderson, and Kazerski made it appear that Jolland ordered millions of dollars of clothing from Romtex, which was to be manufactured and sold by Romtex or other secret companies with which it dealt.

The auditors from Moses' companies would not have been willing to accept the legitimacy of the Jolland/Romtex business relationship, had they been aware that both Jolland and Romtex were controlled by the same person. To make Romtex appear to be independent, Anderson, directed by Moses, led the activities of Romtex through a Swiss chairman, Hermann Heller. Anderson convinced Heller and other advisors of Ilene Moses, that he was the representative of a secret cartel that controlled Romtex. ASTC, Billion Up, and Chathill, Ltd., were created to further the impression that Jolland was doing business with real companies. Moses' financial advisors were unaware that these shell companies were under the control of Moses, Anderson, and Kazerski. ASTC, for instance, was a shell company operated by a secretarial service Carrick had retained in Hong Kong, known as Hayes Secretaries, Ltd. At the direction of Moses, Kenneth Kazerski and Lawrence Anderson had Hayes Secretaries transmit documents which gave the appearance that the textile and clothing business conducted by Romtex AG on behalf of ASTC was real.

In 1986, Michigan National Bank started pressuring Moses for repayment of her loans. So, in June, 1987, Moses obtained a $5 million loan from Swiss Cantonbank, of which $3 million was given to Michigan National Bank as partial payment of her

loans. In April 1988, in order to continue to placate Michigan National Bank, Moses borrowed $300,000.00 from a Catholic missionary order called the Missionaries of Africa. Moses told the missionary the money was needed for a short term loan, when in fact she gave the money to Michigan National Bank as payment from her international business income. Then, in August 1988, Moses was able to secure a $400,000.00 loan from Michigan National Bank by reporting that she needed money to keep her business afloat, to be able to pay the original loans.

In September 1988, Moses told Michigan National Bank and Swiss Cantonbank's successor, Semifora AG, that she would be receiving a $28.3 million loan through a Liechtenstein trust called TRD Foundation, which was controlled by the secret cartel. She used her attorneys to negotiate a loan with TRD Foundation, while controlling both sides of this negotiation. These false negotiations helped persuade Michigan National Bank and Semifora AG to hold off on legal actions against her. It should be noted that TRD Foundation turned out to be an Internal Revenue Service undercover investigation.

In addition, between 1989 and 2002, Moses, Carrick, Oldridge and others defrauded various American and British businessmen for $9,623,802.20. To obtain the direct loans from these businessmen, Moses indicated she was negotiating with the Chinese-based faction of the secret cartel . . . to enter into a multi-million dollar employment contract, which would rehabilitate the People's Republic of China's textile industry.

With this by way of background, we turn to defendant's assignments of error.

## II.

1. Admission of Exhibit 300

Defendant takes the position that Exhibit 300, which consisted of a chart prepared by the government to help the jury organize the numerous substantive exhibits admitted during trial, provided the jury with a "roadmap" to conviction. During deliberations the jury sent a note to the court correcting a mistake in the numbering of one of the documents referenced by Exhibit 300, which defendant contends illustrates how much the jury relied upon the government's summary. During closing argument, the prosecutor suggested the following to the jury:

> This Summary 300, this big sheet of binder that I'm holding up, has in it a chart which identifies the count, the exhibit and briefly describes the exhibit, then it has the exhibits that pertain to each one of those counts where there is a document that pertains to a particular count or series of documents.
>
> So, I think if you use that binder, it would make it a whole lot easier for you [to] go through to look at these things.

During a pre-trial status conference held on November 29, 2006, the court asked defense counsel if he had any objection to the admission of the exhibits. Defense counsel replied that he did not. At trial, however, counsel objected to the exhibit as cumulative and argumentative. The district court disagreed with the characterization of the exhibit as argumentative and noted as well, "sometimes cumulativeness may be helpful to the jury."

In response, counsel adopted another approach, contending that some of the documents included in the summary had not been identified as exhibits or commented upon by witnesses. With respect to his pretrial stipulation, counsel recalled that he agreed to the admission of documents only with respect to authentication and foundation.

The district court recalled the matter differently: "I was led to believe that all the exhibits were admitted, without objection, unless counsel brought to my attention an objection." The judge went on to observe that "every exhibit does not have to be formally admitted." In the wake of that rebuke, counsel replied, "I'll confer with counsel and if we feel that it should be brought back to the Court's attention, we'll do that." No further objection was made.

We note that "[t]he admission of summary charts is a matter within the discretion of the district court, whose decisions in such matters will be upheld absent an abuse of discretion." *United*

*States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998) (quoting *United States v. Williams*, 952 F.2d 1504, 1519 (6th Cir. 1991)).

Defendant stresses the importance of the exhibit by noting that it was the only one that the jury had with it in the jury room.[2]  In addition, twelve exhibits were not formally admitted into evidence during trial.  However, the following exchange occurred on the first day of trial, which sheds some light on why the exhibits were not formally admitted:

Government:  We have not been offering our exhibits as we hand them to the witnesses.

The parties have agreed, among themselves, to follow the same procedure that we followed in the [co-defendant] Larry Anderson trial.  Which is, an exhibit referred to during testimony, is automatically admitted, unless it's offered, unless it's used for a very limited purpose to refresh the recollection.

We've agreed we do not have to authenticate the exhibits.  We've agreed that we don't have to [go] through the process.

Defense:  That's true, except for the Summary Exhibits.  Mr. Heller and I need to have a discussion about that before we bring it to you.

Based upon this exchange, it would seem that the twelve exhibits cited by the defense may have been informally admitted as outlined.  The fact that defense counsel made an exception for summary exhibits would not affect those attached to Exhibit 300.

While Exhibit 300 worked to the government's advantage, we detect no abuse of discretion by the district court in allowing its introduction.  Our review of the exhibit convinces us that the descriptions of the attached exhibits were not argumentative and it fully comports with Federal Rule

---

[2] That assertion is slightly misleading because the referenced exhibits were attached to the index and placed in a binder.

of Evidence 1006, which permits the use of summary exhibits. In this case, of course, the jury had

more than a summary to review; it had the substantive exhibits as well. Finally, it appears that

counsel had agreed to a relatively informal style with respect to the introduction of exhibits.

In light of the deferential standard of review we accord the evidentiary decisions of the

district court, the admission of Exhibit 300 is affirmed.

2. Dismissal of the Indictment

Defendant filed a motion to dismiss the second superseding indictment based upon the

government's seizure of documents, which she alleges were subject to the attorney-client privilege,

during a search incident to another fraud investigation. According to defendant, these documents

were critical to her defense. The district court denied the motion.

This court has recently revisited the appropriate standard of review when reviewing a district

court's decision concerning a motion to dismiss an indictment. *United States v. Grenier*, 513 F.3d

632 (6th Cir. 2008). When the decision is based upon factual findings made by the district court,

we review for clear error; when questions of law predominate, our review is *de novo*. *Id.* at 635-36.

The district court's opinion denying the motion explains the genesis of defendant's

contention that the government compromised her right to mount a defense by seizing privileged

materials. The scheme that triggered this appeal occurred primarily during the 1980s. (The district

court refers to it as the "Romtex fraud.") However, in the course of that investigation, the

government discovered that defendant may have been involved in fraudulent activities in China

during the 1990s. This investigation began to gather steam in 1996, after the original indictment in

the Romtex fraud was handed down. In 1999, the FBI believed that the "China fraud" was being

conducted through a Los Angeles company, Belvoir Ltd.  As a result, the government obtained search warrants from the United States District Court for the Central District of California for Belvoir's offices and the homes of defendant and the company's president, Michael Berlin.  FBI Agent Donald Troccoli swore an affidavit in support of the searches.  Based in Detroit, Troccoli had spent several years investigating the Romtex and China frauds.

On March 30, 1999, the day that the searches were executed, FBI agents seized 66 boxes of material.  Agents segregated six boxes of potential attorney-client information. The district court relied upon the government's assertion in a filing below that the seized materials, including those that might be privileged, were held in a secure location in Los Angeles under FBI control.  In the same filing, the government stated that no member of the Romtex team had seen any of the documents.

The district court concluded that defendant was not entitled to relief because there was "no evidence that the prosecution team actually involved in prosecuting this case has been exposed to such materials; nor does this Court believe that the fact that such materials may have been disclosed to some other government agents, who are not involved in the prosecution of Defendant's case, warrants dismissal of the indictment."  Dist. Ct. Op., Dec. 29, 2000 at 9-10.

A Sixth Amendment violation based upon intrusion on the attorney-client relationship only occurs if prejudice is shown.  *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977); *Sinclair v. Schriber*, 916 F.2d 1109, 1112 (6th Cir. 1990) ("In *Weatherford*, the Supreme Court held that in order to establish a violation of the Sixth Amendment right to counsel ensuing from government surveillance, a claimant must not only show that conversations with an attorney were surreptitiously

monitored, but must also show that the information gained was used to prejudice the claimant's

defense in his criminal trial."). Moreover, a showing of prejudice is required even where there is an

intentional intrusion by the government into the attorney-client relationship. *United States v. Steele*,

727 F.2d 580, 586 (6th Cir. 1984).

Other circuits have found prejudice when the government's actions in seizing privileged

material were intentional, which they undeniably were here. These cases are distinguishable from

the instant case, however. In *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995), for instance, the

Tenth Circuit adopted the following standard:

> Because we believe that a prosecutor's intentional intrusion into the
> attorney-client relationship constitutes a direct interference with the Sixth
> Amendment rights of a defendant, and because a fair adversary proceeding is a
> fundamental right secured by the Sixth and Fourteenth Amendments, we believe that
> absent a countervailing state interest, such an intrusion must constitute a *per se*
> violation of the Sixth Amendment. In other words, we hold that when the state
> becomes privy to confidential communications because of its purposeful intrusion
> into the attorney-client relationship *and lacks a legitimate justification for doing so*,
> a prejudicial effect on the reliability of the trial process must be presumed. In
> adopting this rule, we conclude that no other standard can adequately deter this sort
> of misconduct.

*Id.* at 1142 (emphasis added). Even if we were to apply this standard, which is admittedly stricter

than this circuit's showing of prejudice requirement, *see Steele*, 727 F.2d at 586, defendant would

still not prevail. The government had a legitimate reason for the seizure: its investigation of the

China fraud.

As defendant recognizes, she must demonstrate prejudice in order to prevail. That is an

onerous task and, in our view, defendant has failed to do so. We review the factual findings of the

district court for clear error. *Grenier*, 513 F.3d at 635-36. Here, the district court concluded that

"[d]efendant has produced absolutely no evidence that any member of the prosecution team was exposed to potential attorney-client privileged material." Dist. Ct. Op., Dec. 29, 2000 at 17. We find nothing in the record to call this conclusion into question and therefore affirm the district court's denial of defendant's motion to dismiss the indictment.

3.  Disputed Witness

The first witness called by the government at trial was Dr. Lourdes Andaya, a neurologist, friend of defendant's, and an investor who began by putting up $20,000 in 1979 on the promise that she could get high rates of return. In its opening argument, the government highlighted that she was "not a banker, not a lawyer, not an accountant, not a co-defendant, not somebody who passed on false information," but rather a friend of defendant's who invested in a forerunner of the "secret cartel story." In the end, Andaya did not lose any money.

Defendant filed a motion to exclude her testimony as prejudicial under Fed. R. Evid. 403, or in the alternative, as inadmissible pursuant to Fed. R. Evid. 404(b). The district court denied the motion. Under both Rules 403 and 404(b), we review for an abuse of discretion the district court's determination whether the probative value of the evidence outweighed potential prejudice to the defendant. *See United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996) (Rule 404(b)); *United States v. Foster*, 376 F.3d 577, 592 (6th Cir. 2004) (Rule 403).

With respect to unfair prejudice, defendant focuses on the fact that Andaya testified about actions which preceded the indictment. Moreover, the government introduced her because she was a sympathetic witness even though, according to defendant's brief, her testimony "had no probative

value and served no legitimate purpose other than to make it appear as though Moses would defraud even her friends."

This assignment of error need not detain us long. First, in the context of the entire trial, Dr. Andaya's testimony played a minor role – certainly, not one resulting in the kind of prejudice that would call the integrity of the verdict into question. Second, her testimony did not, as defendant puts it in her brief, lead to the jury to believe that defendant would "defraud her friends." To the contrary, the doctor indicated that she was – admittedly after a good deal of persistence – ultimately repaid. Finding no abuse of discretion on the part of the district court, we affirm its decision permitting the challenged testimony.

4. Sentencing Considerations

Defendant raises two sentencing issues on appeal: first, that insufficient evidence supported the district court's calculation of "related conduct"; second, that her sentence was greater than necessary to satisfy the objectives of 18 U.S.C. § 3553(a).

A. Related Conduct

When sentencing defendant, the district court included an additional $3.5 million in proceeds obtained from an investor named Hoyt Pardee in its calculation of the loss resulting from her money laundering. Pardee, however, was involved in the "China fraud" rather than the "Romtex fraud." Defendant contends that the government presented insufficient evidence at the sentencing hearing to support the district court's inclusion of this money even under the preponderance of the evidence standard.

FBI Agent Troccoli testified at the sentencing hearing that Pardee provided defendant with $3.5 million to "keep her [China] business going." He went on to say, "The money went through various banks and ultimately landed in the Bank of China at New York." From there defendant used it in her fraud scheme. In our view, the $3.5 million falls under the "relevant conduct" section of the Guidelines. U.S.S.G. § 1B1.3. When money laundering is the conviction, the "value of funds laundered" affects the sentence. U.S.S.G. § 2S1.1(a)(2).

### B. Defendant's Health

Section 3553(a) of Title 18 counsels district courts to impose sentences "sufficient, but not greater than necessary" to reflect the seriousness of the offense, to provide adequate deterrence, and to give defendant the most effective treatment while incarcerated. Defendant contends that it is substantively unreasonable to sentence an elderly, ill woman to such a harsh prison term for nonviolent, economic crimes. While we are sympathetic to defendant's health issues, the district court made clear that the scope of the fraud was the most extensive that it had encountered in thirty years. Moreover, the court indicated that it had considered defendant's various health ailments when imposing its sentence.

While a district court *may* sentence infirm defendants to a non-prison sentence, *United States v. McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008), it need not do so. The district court gave proper consideration to the factors listed in § 3553(a) and concluded that the severity of defendant's conduct outweighed the mitigating factors of her age and infirmities. We affirm.

### III.

The judgment is **affirmed.**