**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0803n.06

**No. 11-3934**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Sep 03, 2013

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| KEVIN DYE, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |

Before: KETHLEDGE, WHITE, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. In August 2009, a bar in Mansfield, Ohio was set on fire. Four months later, the courthouse in the Mansfield City Hall building was firebombed. Defendant Kevin Dye became a suspect in each fire. Following a search of one of his residences, where a number of incriminating items were found, Dye was arrested and eventually charged in a three-count indictment for violations of 18 U.S.C. §§ 844(i), 924(c)(1)(A), and 924(c)(1)(B)(ii). Dye was found guilty on all three counts and sentenced to an effective term of 60 years. He appeals, raising seven issues. For the following reasons, we **AFFIRM** Dye's convictions, his sentence, and the rulings of the district court challenged here.

**BACKGROUND**

This case arises out of two fires that occurred in Mansfield, Ohio in 2009: the first at Belcher's House of Rock and the second at the Mansfield City Hall, where courtrooms on the second

floor were targeted. Dye was charged with violating 18 U.S.C. § 844(i) for the fire at Belcher's (Count 1); violating 18 U.S.C. § 844(i) for the fire at the courthouse (Count 2); and violating 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii) based on the devices used to start the fire in the courthouse (Count 3). The salient facts adduced at trial are as follows.

Thomas Belcher, the bar's owner, testified that Dye was involved in an altercation on August 1, 2009. Belcher asked Dye to leave, called the police, and informed Dye that he was no longer welcome at the bar, to which he replied "I will see this bar closed." Seven days later, Belcher's was set on fire. Gasoline and oil had been poured onto the floor to ignite the blaze. Julie Brown, Dye's girlfriend who lived with him at 827 Delph Avenue in Mansfield, stated that on the night of the fire she had plans to meet a friend at Belcher's, but Dye instructed her not to go. When Dye returned home around 5:00 a.m., he smelled of gasoline and claimed that he had been working on a car. A car mat left outside the house also emitted a strong odor of gasoline.

Brown testified that Dye "sort of got obsessed with" the fire and asked her to go to Belcher's each day to find out whether there was a suspect. When she informed Dye that a police officer asked her to get information from him because he was a suspect, he smirked and laughed. Brown claimed that Dye also acted suspiciously upon viewing an article in the newspaper about the fire. At some point after the fire, Dye asked Brown to retrieve a red gas can and a pair of white Nike shoes from one of his other houses and asked her to hide the gas can. Dye burned the shoes in a bonfire.

On December 14, the Mansfield City Hall building, which contained the mayor's office, the Mansfield Police Department, courtrooms, and the city attorney's office, was firebombed. The second floor which housed the courtrooms was targeted, and the fire itself occurred in the office

of Judge Payton's bailiff. Judge Payton was scheduled to hear several cases involving Dye, including one arising out of the Belcher's altercation.

Four plastic one-gallon jugs were found in the office, one with a "Tigger" hand towel stuffed into the cap. Investigators determined that the fire was set by igniting a wick on a gasoline-soaked rag and throwing the devices into the building. The jugs exhibited signs of having been on fire, and some had pieces of melted duct tape on them. An explosives expert from the Bureau of Alcohol, Tobacco, and Firearms testified that gasoline was used in the "rudimentary" but "very effective" devices. Samples taken from inside the courthouse tested positively for gasoline.

Brown testified that on December 13, Dye asked her to bring empty milk jugs and gasoline to his house on Delph. When Dye arrived at her niece's home around 1:00 a.m., Brown stated that he smelled of gas and again claimed to have been working on a car. Dye left later that same morning, and Brown suspected that Laurie Butler, with whom Dye was also involved, picked him up. Brown sent Dye several text messages expressing her anger about that relationship.

Brown testified that Dye asked her to drive by his various properties, including the house on Fairlawn, where Butler lived, "to see what was going on." She was pulled over by the police near the Fairlawn house and told that they were looking for Dye. When Brown informed Dye, he told her "not to say anything." Later than night, Dye asked Brown to drive him to Bucyrus; she declined, but allowed him to borrow her car.

After Dye became a suspect, the authorities obtained a search warrant for 363 Fairlawn Avenue, where it appeared both a male and female resided.[1]  A key taken from Dye at the time of his arrest fit one of the locks there.  There was a strong odor of gasoline in the home, and the washing machine contained clothing that smelled of gasoline and later tested positive for it.  White tennis shoes also tested positive for gasoline.  Duct tape, a gas can, an empty one-gallon plastic jug, a cap for a gallon jug with a hole cut out of it, and a Tigger towel were found.  The duct tape found on the jugs at the bailiff's office and the tape found at Dye's home were made by the same manufacturer and used the same manufacturing process.

A gasoline container was found in a black Nissan Altima belonging to Butler, and its floor mats tested positive for gasoline.  A number of latex gloves were found in the glove compartment, and no usable fingerprints were lifted from the vehicle.  A business card for Claire Shaw Goines, Judge Payton's bailiff, was also located inside the car, and a sketch of the court, along with a print-out of Judge Payton's docket, was found in the house.  A sledgehammer and shoes taken from the residence contained glass fragments.  The glass matched samples taken from the bailiff's office windows.

At the close of the Government's case, the defense unsuccessfully moved for dismissal pursuant to Federal Rule of Criminal Procedure 29.  The defense then called Scott Stephens as a witness, who testified that Dye arrived at Stephens's girlfriend's home in Bucyrus and stayed there

[1]One of Butler's neighbors testified that Butler and her boyfriend, whom he knew as Kevin Dye, lived at the residence, and that he had witnessed Dye driving Butler's vehicles.  The neighbor testified that the day before the police searched Butler's home, he saw Dye coming and going from her house in all four of their vehicles.

on the evening of the courthouse fire. Because Stephens previously claimed that he had not spoken with Dye after his arrest, during cross-examination the Government played a phone conversation between Dye and Stephens that occurred when Dye was in jail. The conversation indicated that Dye attempted to convince Stephens and his girlfriend to serve as alibi witnesses.

The jury found Dye guilty on all three counts. Although his counsel did not renew the motion for judgment of acquittal at the close of proof, Dye filed a pro se motion, which was denied because he was represented by counsel.

Dye's presentence report (PSR), which provided for a base offense level of 24 on Counts 1 and 2 (and which grouped these counts), suggested a two-point adjustment for obstruction of justice pursuant to USSG § 3C1.1 and a 12-point adjustment pursuant to USSG § 3A1.4 because Count 2 involved a federal crime of terrorism. The conviction on Count 3 for use of a destructive device during a crime of violence carried a sentence of not less than 30 years, to be served consecutively to any other term of imprisonment. Following a hearing, the district court imposed a sentence of 180 months on Counts 1 and 2 and a sentence of 360 months on Count 3, to be served consecutively, for a total sentence of 720 months. Dye was also required to pay substantial restitution to Belcher's, the City of Mansfield, and their respective insurers. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

In reviewing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v.*

*Semrau*, 693 F.3d 510, 524 (6th Cir. 2012) (internal quotation marks omitted). However, when a motion for judgment of acquittal is not renewed at the close of all the evidence, this court reviews the sufficiency of the evidence challenge under "the 'manifest miscarriage of justice' standard," *United States v. Kolley*, 330 F.3d 753, 756 (6th Cir. 2003), which this court has interpreted to mean that "the record is 'devoid of evidence pointing to guilt.'" *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (quoting *United States v. Robles-Pantoja*, 887 F.2d 1250, 1254 (5th Cir. 1989)).

The Government argues that the more stringent "manifest miscarriage of justice" standard should apply because Dye was represented by counsel when he filed his pro se motion for judgment of acquittal. Dye contends that because the district court permitted "hybrid representation," the issues raised in his post-verdict motion were properly preserved. We find it unnecessary to resolve this dispute. Even if reviewed under the less stringent standard, we conclude that Dye's challenge to the sufficiency of the evidence cannot succeed.

### A. 18 U.S.C. § 844(i) (Counts 1 & 2)

Dye argues that the evidence is insufficient to support his convictions for violating 18 U.S.C. § 844(i), which prohibits "maliciously damag[ing] . . . by means of fire or an explosive, any building" that is used in interstate commerce or in any activity affecting interstate commerce.[2] As

---

[2]"Maliciously," which is not defined in the statute, has been interpreted by our sister circuit(s) to mean that "the defendant acted intentionally or with willful disregard of the likelihood that damage or injury would result from his or her acts." *United States v. Gullett*, 75 F.3d 941, 948 (4th Cir. 1996); *see also United States v. Monroe*, 178 F.3d 304, 307 (5th Cir. 1999). This is the definition that was used at common law; "[b]ecause Congress did not define the term . . . we must assume that [it] adopted" this definition. *United States v. Minerd*, 112 F. App'x 841, 845 (3d Cir. 2004); *see also United States v. Wiktor*, 146 F.3d 815, 818 (10th Cir. 1998).

to Count 1, Dye argues that the evidence is insufficient to support his conviction because there was no direct testimony or evidence connecting him to the Belcher's fire. However, "'[c]ircumstantial evidence by itself can support a defendant's conviction.'" *United States v. Bailey*, 553 F.3d 940, 953 (6th Cir. 2009) (quoting *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003)). The following evidence provided sufficient circumstantial connections between Dye and the Belcher's fire to support his conviction: (1) Dye stated that he would see that Belcher's closed a week before the fire; (2) he warned Brown not to go to Belcher's the night of the fire; (3) he arrived at Brown's house shortly after the fire smelling of gasoline; (4) after the fire, Dye asked Brown to retrieve tennis shoes from his residence, which he burned; and (5) Brown testified that Dye became "obsessed" with the fire. A rational trier of fact could find that this evidence established beyond a reasonable doubt that Dye was responsible for maliciously damaging Belcher's by starting a fire there.

Dye's arguments as to Count 2 are essentially the same: he argues that the Government failed to connect the evidence found at the Fairlawn residence either to him or to the evidence found at the courthouse. The circumstantial evidence supporting this count, however, is even stronger. Butler's neighbor testified, and evidence at the home indicated, that Dye resided with Butler. Empty milk jugs, a cap with a hole cut in it, and a Tigger towel were found at the Fairlawn residence and in the bailiff's office. A map of the courthouse and a print-out of Judge Payton's docket were found during the search. Glass fragments matching the glass in the office's windows were found in a sledgehammer and shoes retrieved from the Fairlawn residence. The washing machine contained clothes that smelled of gas, Butler's Altima    which Dye used    smelled of gas, and there was a gas

can in the trunk. Brown also testified that Dye smelled of gas upon returning home during the early morning hours of December 14.

Although Dye argues that the evidence found at the Fairlawn residence could have been found in any house in Mansfield, we must view the evidence in the light most favorable to the Government: we accept the inferences connecting Dye with the Fairlawn residence and the inferences connecting the items found there with those retrieved from the scene of the courthouse fire. Succeeding on a challenge to the sufficiency of the evidence at this point "is a very heavy burden for the convicted defendant to meet." *Semrau*, 693 F.3d at 524 (internal quotation marks omitted). Dye has not met that burden. The Government presented more than enough evidence to allow a rational trier of fact to find, beyond a reasonable doubt, that Dye was responsible for the courthouse fire.[3]

**B.      18 U.S.C. § 924**

18 U.S.C. § 924(c)(1)(A) provides particular punishments for the use of a firearm "during and in relation to any crime of violence." 18 U.S.C. § 924(c)(1)(B)(ii) specifies that "[i]f the firearm possessed by a person convicted of a violation of this subsection . . . is a . . .destructive device . . ., the person shall be sentenced to a term of imprisonment of not less than 30 years." "Destructive

---

[3]Dye also argues, without much analysis, that the evidence fails to establish that the courthouse was used in interstate commerce. The Government contends that, although lacking merit, this argument was waived because it was not raised in the Rule 29 motion. *See United States v. Dandy*, 998 F.2d 1344, 1356-57 (6th Cir. 1993). Even assuming the argument was preserved, we agree that it is without merit. We have previously held that a local fire station was used in an activity that affected interstate commerce for purposes of 18 U.S.C. § 844(i). *See United States v. Laton*, 352 F.3d 286, 302 (6th Cir. 2003). There was ample evidence at trial that the courthouse met this standard.

device" is defined as any explosive, incendiary bomb, or device similar to any of the devices described in this statutory provision. 18 U.S.C. § 921(a)(4)(A)(i), (vi). Dye argues that there is insufficient evidence to demonstrate that an "incendiary device" was used in the courthouse fire because nothing shows that the milk jugs were capable of explosively spreading gas and they were meltable   rather than breakable like a traditional Molotov cocktail   which he deems dispositive.

It does not appear that we have addressed the specific type of device at issue.[4]  In *United States v. Graziano*, 616 F. Supp. 2d 350, 360 (E.D.N.Y. 2008), *aff'd* 391 F. App'x 965 (2d Cir. 2010), a district court concluded that a device strikingly similar to those used here "qualifie[d] as an 'incendiary bomb' and, thus, as a 'destructive device.'"  Like Dye, the defendant in *Graziano* attempted to distinguish the plastic container devices used from traditional Molotov cocktails. *Id.* at 362.  The court found that the device fell within the definition of a destructive device, explaining:

> Most of the characteristics of a Molotov cocktail still existed with [the defendant's] device   namely, when one lights an open container of gasoline and throws it, droplets of fuel are expelled in the air during flight and ignited . . . potentially covering a large area and, when the container eventually hits the ground, the droplets of gas disperse further out of the open mouth of the container, again scattering the gas over a large area.  In other words, a Molotov cocktail is designed to release gasoline quickly over a large area which vaporizes and burns, which was the same purpose of the device in this case.  The use of a plastic   rather than glass   container does not eliminate this impact; rather, it simply makes it potentially less potent and effective than it otherwise might be.

*Id.* (internal citation omitted).  As noted in *Graziano*, *see id.*, other circuits have ruled that devices using plastic containers qualify as destructive devices under the statute. *See, e.g.*, *United States v.*

---

[4]We have, however, concluded that more traditional Molotov cocktails constitute destructive devices. *See, e.g.*, *United States v. Cruz*, 270 F. App'x 393, 395-96 (6th Cir. 2008) (per curiam); *United States v. Rowan*, 518 F.2d 685, 688-89 (6th Cir. 1975).

*Hedgcorth*, 873 F.2d 1307, 1310-12 (9th Cir. 1989) (holding that firebombs constructed from plastic water jugs filled with gasoline, motor oil, and soap constituted destructive devices).

This authority provides ample support for concluding that the devices used by Dye constituted "destructive devices" for purposes of 18 U.S.C. § 924. Accordingly, we find that the evidence was sufficient to establish the relevant statutory requirements beyond a reasonable doubt.

## II. Cross-examination of Brown

Dye argues that the district court abused its discretion by prohibiting him from questioning Brown about whether her involvement with children's services informed her decision to testify against him.

Although the Confrontation Clause of the Sixth Amendment's "main and essential purpose" is to provide the defendant with the opportunity for cross-examination, *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal quotation marks omitted), "[t]he district court retains 'wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Reid*, 625 F.3d 977, 986 (6th Cir. 2010) (quoting *Van Arsdall*, 475 U.S. at 679). A district court's decision to limit the scope of cross-examination, which is reviewed under the abuse of discretion standard, "assess[es] . . . whether[, despite the limitation of cross-examination,] the jury was otherwise in possession of sufficient information . . .to make a discriminating appraisal of a witness' motives and bias." *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002) (internal quotation marks omitted and second alteration in original).

On direct examination, Brown testified that she initially thought she and Dye were exclusive, but later found out that he was seeing other women. She also explained that she did not tell police during her first interview that she was with Dye the night of the fire because he instructed her not to say anything and she was afraid. She later contacted the police, however, because she had children to care for and did "not want to get in trouble for any of this." The jury also heard about Brown's text messages to Dye expressing her disdain for Butler. On cross-examination, defense counsel asked Brown whether, at the time of her interview with the authorities, she was involved with children's services. Upon the Government's objection, defense counsel argued that Brown's answer would go to bias, and noted that during *Laurie Butler's* interview, an officer stated that she should be fearful of the police because "we can have your son taken away from you." Defense counsel was not allowed to explore this issue because there was nothing indicating that police made a similar threat to *Brown* during her interview.

We agree with the district court's decision. There is nothing indicating that the authorities threatened Brown regarding the custody of her children in order to procure information about Dye, and she testified that one of the reasons she cooperated with the authorities was because of her children. More importantly, Brown testified about her relationship with Dye, which revealed that she was angry because he was less than candid with her about their exclusivity. This matter spoke to Brown's bias and adequately allowed the jury "to make a 'discriminating appraisal' of [Brown's] motives and bias." *United States v. Lanham*, 617 F.3d 873, 884 (6th Cir. 2010) (quoting *Kone*, 307 F.3d at 436).

Even assuming that the limitation on cross-examination was improper, it would be harmless error. *See Van Arsdall*, 475 U.S. at 684. For this analysis, a court looks to factors including: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* Brown's testimony was undoubtedly important it established that Dye appeared at her home shortly after each fire smelling of gas; outlined Dye's suspicious interest in the Belcher's fire; placed him in Mansfield, not Bucyrus, the night of the courthouse fire; and established that Dye was aware the authorities were looking for him. While her testimony on certain points was not cumulative, Dye's alibi witnesses were able to challenge her testimony regarding Dye's whereabouts on the night of the courthouse fire. Other than on the point at issue, cross-examination of Brown was not restricted. Moreover, the circumstantial evidence connecting Dye to the fires was strong; the Government's case was not wholly dependent on Brown's testimony. *See Hargrave v. McKee*, 248 F. App'x 718, 727 (6th Cir. 2007) ("[W]here . . . the Government's case may stand or fall on the jury's belief or disbelief of one witness, h[er] credibility is subject to close scrutiny." (internal quotation marks omitted)). Therefore, even if the district court abused its discretion by limiting Dye's cross-examination of Brown, it would have been harmless error.

## III.    Introduction of Exhibits

Dye argues that certain exhibits from the Fairlawn residence photographs of the house's interior; liquid samples; clothing; duct tape; a police scanner; a red gas can; an empty milk jug; a

brown cap with a missing piece and the corresponding piece cut out from it; men's clothing found in the bedroom; shoes; and a lock were erroneously admitted because they were not directly connected to Dye or to the scene of the crime and thus were not relevant. A district court's decision regarding the introduction of exhibits is an evidentiary ruling reviewed for an abuse of discretion. *See Unites States v. Moses*, 337 F. App'x 443, 447-48 (6th Cir. 2009). In doing so, we "must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (internal quotation marks omitted).

"Rule 401 sets a low threshold for relevancy." *United States v. Worthington*, 145 F.3d 1335, 1998 WL 279379, at *8 (6th Cir. 1998) (table decision). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401(a) (b). Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, advisory committee's note.

Although there was no direct connection between Dye, the items found at the Fairlawn residence, and those from the crime scenes, such a high threshold is not required for relevance. The testimony regarding Dye's relationship with Butler and her neighbor's belief that Dye lived with her at the Fairlawn residence made it more likely that the items found there were connected to him. The clothes (which were the size a man of Dye's height and weight would likely wear) and the lock,

which Dye's key matched, strengthened the inference that Dye resided with Butler. The other items found in the home    similar to items found at the scene of the courthouse fire or reasonably related to planning the fires    strengthened the inference that Dye was connected with the crimes. There is nothing about this evidence that would have caused the jury to find guilt on an improper basis. In addition, defense counsel challenged these inferences through cross-examination. Because the items were relevant to the question of guilt and their admission not unfairly prejudicial to Dye, we conclude that the district court did not abuse its discretion in admitting them.

## IV.    Double Jeopardy

Prior to trial, Dye argued that Counts 2 and 3 of the superceding indictment were multiplicitous because the destructive devices in both counts were the same and involved the same course of conduct. The district court rejected Dye's arguments after determining that Congress clearly intended separate punishments under 18 U.S.C. §§ 844(i) and 924(c). We review this decision de novo. *See United States v. Mardis*, 600 F.3d 693, 696 (6th Cir. 2010).

Supreme Court precedent holds that "[w]here . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct," cumulative punishment may be imposed following a single trial. *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983). This circuit and others[5] have held that cumulative punishment

---

[5] *See United States v. Holdridge*, 30 F.3d 134, 1994 WL 399526, at *1-3 (6th Cir. 1994) (table decision); *see also United States v. Eddington*, 416 F. App'x 258, 263-64 (4th Cir. 2011) (per curiam); *United States v. Smith*, 502 F.3d 680, 691 (7th Cir. 2007); *United States v. Strickland*, 261 F.3d 1271, 1274 (11th Cir. 2001); *United States v. Nguyen*, 117 F.3d 796, 797 (5th Cir. 1997) (per curiam); *United States v. Collins*, 109 F.3d 1413, 1419-20 (9th Cir. 1997); *United States v. Swapp*, 934 F.2d 326, 1990 WL 299279, at *15-16 (10th Cir. 1990).

under the circumstances presented here is appropriate. We have specifically observed that the language of § 924(c) and its legislative history demonstrate that Congress intended cumulative punishment for violation of that provision and certain other predicate offenses, even if the convictions stem from the same course of conduct. *See United States v. Holdridge*, 30 F.3d 134, 1994 WL 399526, at *1-3 (6th Cir. 1994) (table decision). Although, as Dye points out, the Supreme Court has not explicitly ruled on this issue, it is clear under the applicable legal principles and the weight of authority that the imposition of cumulative punishment for Counts 2 and 3 was appropriate.

## V.     Flight Instruction

Although conceding that his trial counsel failed to object to the jury instructions on flight, Dye argues they were plainly erroneous because the evidence showed that he failed to turn himself in, not that he engaged in flight. The Government contends that there was no error, and even if error occurred, the jury was given the choice of considering the evidence of flight and, moreover, the additional evidence implicating Dye was overwhelming.

In order to obtain relief under these circumstances, Dye must establish that "(1) an error occurred; (2) the error was plain, i.e., obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Lucas*, 640 F.3d 168, 173-74 (6th Cir. 2011). "In the context of challenges to jury instructions, [p]lain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United*

*States v. Castano*, 543 F.3d 826, 833 (6th Cir. 2008) (alteration in original) (internal quotation marks omitted).

Evidence of flight that has probative value is admissible as evidence of guilt, and the jury may decide how much weight to give it. *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989). This court has adopted a four-step analysis to determine the probative value of such evidence, which

> depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Id.* at 1127 (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)). A district court's decision to instruct the jury on flight is reviewed for an abuse of discretion. *See id.* at 1126.

We conclude that the district court did not err in instructing the jury on flight, as the evidence fairly supported it. First, Dye consciously sought to avoid his properties and then borrowed Brown's car in order to leave Mansfield for Bucyrus shortly after the courthouse fire. "A 'flight' instruction is not improper when a defendant leaves the community where the crime was committed within a reasonably short period of the crime." *United States v. Rowan*, 518 F.2d 685, 691 (6th Cir. 1975). In addition, Dye sent Brown to his properties and to Belcher's to find out what was happening, rather than go himself. Sending another person to investigate whether a police investigation is occurring at one's property or at the scene of a crime is suggestive of a guilty conscience, the inference being that the person sought to avoid an encounter with the authorities. The second and third inferences,

which are somewhat interrelated, involve looking at the immediacy of the flight "and the defendant's knowledge that he is in trouble with the law." *Dillon*, 870 F.2d at 1128. Dye knew that the authorities were searching for him    he was informed by Brown    and engaged in evasive acts after the courthouse fire occurred. As to the fourth inference, there was substantial evidence found at the Fairlawn residence connecting Dye with the crimes at issue. This record does not establish an abuse of discretion.

Even if we assume error, there was an abundance of evidence connecting Dye to the arsons, and the instruction cautioned the jury that Dye's "conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may commit this same action for some other reason." Even if a flight instruction was erroneous, it does not affect a defendant's substantial rights where there was "overwhelming evidence against him" and the district court instructs that "evidence of flight is not dispositive of guilt." *United States v. Atchley*, 474 F.3d 840, 854 (6th Cir. 2007); *cf. also United States v. Wilson*, 385 F. App'x 497, 501 (6th Cir. 2010) (observing that "the limiting instructions in the jury charge minimized the potential for prejudice to" the defendant). We find the same to be the case here and conclude that there was no error, much less plain error.

## VI.    USSG § 3A1.4

Dye received an offense level increase of 12 pursuant to USSG § 3A1.4. Such an increase is appropriate "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The application notes instruct that "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. 2332b(g)(5)." USSG § 3A1.4 comment. (n.1). A "federal crime of terrorism"

is "an offense that . . . (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct[] and (B) is a violation of . . . [18 U.S.C. §]844(i)." 18 U.S.C. § 2332b(g)(5)(A) (B)(i). Dye contends that the record does not support a finding that the firebombing of the courthouse was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

The district court found that the following facts established, by a preponderance of the evidence,[6] the applicability of USSG § 3A1.4:

> [T]he firebombing location was not random, based upon the evidence [that] the four windows in this particular building that . . . served the judge's chambers and the bailiff's office area were broken; the fact . . . [that] case files for that particular court and judge were kept in the office; the sketch that was found; . . . the business card of the bailiff that was found in . . . the defendant's car or car driven by [him]; [and] the six pending cases, two of which had imminent trial dates.

The court found that it was "reasonable to draw the inference[] that . . . the attack was . . . targeted and that there was no other reason but to affect the operations of the [c]ourt, or perhaps even . . . retaliation because of the pending cases." We review the district court's application of a sentencing guideline de novo and its factual findings for clear error. *United States v. Graham*, 275 F.3d 490, 513-14 (6th Cir. 2001). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002) (internal quotation marks omitted).

---

[6]"[T]he government bears the burden to 'prove, by a preponderance of the evidence, that a particular sentencing enhancement applies.'" *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012) (quoting *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003)).

We agree with the district court    a natural inference from the above-listed facts is that Dye sought to disrupt the functions of the court he was to appear before or to retaliate against the institution for the charges pending against him.  Dye argues, however, that there was no testimony from him indicating his motivation.  He contends that his case is distinguishable from *United States v. Harris*, 434 F.3d 767, 774 (5th Cir. 2005), upon which the Government relies, because there, the defendant pled guilty and testified that his intent in throwing Molotov cocktails into a municipal building "was to destroy evidence that related to his father's arrest."  That Dye's case did not include his admission of intent does not render the district court's determination clearly erroneous    Dye's intention to intimidate or retaliate through firebombing the courthouse could appropriately be established through circumstantial evidence.  *Cf. Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (observing, in the context of § 1983 claim, that "retaliation rarely can be supported with direct evidence of intent" (internal quotation marks omitted)).  In light of the evidence presented, we do not have a "definite and firm conviction that a mistake has been committed." *Tocco*, 306 F.3d at 284.  Application of this enhancement factor was appropriate.

## VII.    USSG § 3C1.1

Dye argues that the district court's application of the USSG § 3C1.1 enhancement for obstruction of justice is not supported by the record.

USSG § 3C1.1 provides that a defendant's offense level may be increased by two levels if "(1) the defendant willfully . . . attempted to obstruct or impede[] the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction."  The guideline specifically mentions

"committing, suborning, or attempting to suborn perjury" as conduct to which it applies. USSG § 3C1.1. comment. (n.4(B)). Perjury consists of "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). A material matter is one that "if believed, would tend to influence or affect the issue under determination." USSG § 3C1.1 comment. (n.6). Although this circuit has applied two different standards of review in evaluating a district court's application of the obstruction of justice enhancement    a three-part standard[7] and "a more deferential standard that applies clear error review to the entire analysis"    we have not definitively endorsed either. *United States v. Gauna*, 485 F. App'x 70, 77-78 (6th Cir. 2012). Resolution of this discrepancy is unnecessary here, as under either standard, we conclude that the district court did not err.

Prior to trial, Dye served a notice of alibi pursuant to Federal Rule of Criminal Procedure 12.1, which listed, among others, Scott Stephens, who subsequently testified at trial on Dye's behalf. In its sentencing memorandum, the Government contended that Dye suborned perjury by presenting Stephens as a witness. Stephens testified that Dye spent the night at Stephens's girlfriend's house in Bucyrus, yet the Government noted that this assertion was flatly contradicted by Brown's testimony (and the supporting text message) that Dye stayed with her in Mansfield. The Government also pointed out Dye's phone call to Stephens in which he asked Stephens whether his girlfriend was

---

[7]This standard of review (1) looks to whether the district court's factual determinations were clearly erroneous; (2) reviews the district court's conclusion that the facts establish obstruction of justice    a mixed question of law and fact    de novo; and (3) reviews application of the enhancement de novo. *United States v. Gauna*, 485 F. App'x 70, 77 (6th Cir. 2012).

on board with the alibi. In finding the enhancement applicable, the district court relied primarily on the reasons articulated in the Government's brief, but added that, in its estimation, Stephens was a particularly incredible witness.

Dye contends that the findings of the district court were inadequate based on its reliance on the Government's brief. The Government's reasoning    that Dye sought out Stephens as an alibi witness, but that contrary testimony at trial implied that Dye arranged for a false alibi    adequately establishes "that enhancement [was] appropriate on the basis of a finding of obstruction of justice that encompasse[d] all the factual predicates of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002). The district court adopted the Government's reasoning as part of its findings. Application of the obstruction of justice enhancement in this scenario is appropriate. *See United States v. Bradberry*, 466 F.3d 1249, 1254-55 (11th Cir. 2006) (per curiam) (holding the enhancement applicable "when the defendant calls a witness to testify on his behalf knowing that the witness will give perjured testimony"); *cf. United States v. Jones*, 612 F.3d 1040, 1046-47 (8th Cir. 2010) (concluding that the evidence supported the district court's application of the obstruction of justice enhancement where the defendant "gave his brother, who testified before the grand jury, false information" about where he was at the time of the crime, which was material to the offense "because it provided [the defendant] with an alibi").

Dye suggests that because the jury rejected Stephens's testimony, it was not material, and therefore the enhancement was inappropriately applied. However, materiality goes to the subject matter of the testimony, not to the jury's acceptance of it. And the "impediment to or obstruction of justice" need not be effectuated, as the enhancement is applicable upon an attempt to accomplish

these goals. *See Dunnigan*, 507 U.S. at 95. Moreover, Stephens's testimony, which indicated that Dye spent the entire night of the courthouse fire in Bucyrus, was a matter that "if believed, would tend to influence or affect the issue under determination." USSG § 3C1.1 comment. (n.6). Accordingly, the district court's application of this enhancement factor was not erroneous.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Dye's convictions, his sentence, and the challenged rulings of the district court.